## Case No. 7,598.

### In re KAINE.

[10 N. Y. Leg. Obs. 257.]

Circuit Court. S. D. New York.   July 9, 1852.

HABEAS CORPUS — TREATY BETWEEN THE UNITED STATES AND GREAT BRITAIN.

1. A district judge can hold a circuit court, in the absence of a circuit judge, and exercise all the powers of a circuit court.

2. A district judge allowing a writ of habeas corpus at his chambers in term time of the circuit, may at his discretion, make it returnable in the circuit court.

3. The treaty with Great Britain of August 9, 1842, or the act of congress of August 12. 1848 [9 Stat. 302]. do not affect the authority of the federal courts or judicial officers, in allowing and acting upon a habeas corpus to inquire into imprisonments thereunder.

4. Proceedings in the federal courts on habeas corpus are not governed by state legislation, but are in conformity with common law rules.

5. A prisoner cannot traverse the return to a writ of habeas corpus, nor demand an issue on the legality of his commitment.

6. He may show on the face of the proceedings or aliunde. the incompetency of the magistrate to grant the writ. or that the subject matter was not brought within his jurisdiction.

7. The federal judiciary can execute the provisions of the treaty in respect to fugitives from justice, without any aid from an act of congress.

8. The commissioner who ordered the commitment in this case, was a magistrate within the meaning of the treaty; but he is not authorised in that character to take proceedings under the statute.

9. The magistrate acts upon complaints on oath, and no requisition to him is demanded by the treaty.

[Cited in Re Thomas, Case No. 13,887.]

10. The requisition is a diplomatic act addressed to the government, after commitment of the prisoner.

11. If a preliminary requisition or application to the magistrate be necessary to legalise his action, a resident consul is a proper officer to make it.

12. The act of congress of August 12, 1848, operates in aid of the treaty. The sixth section, authorising a copy of the original deposition to be used, applies if the proceedings be before a magistrate. The provisions of the two are not in conflict, and the question as to the supremacy of the treaty does not arise.

[Cited in Re McPhun, 30 Fed. 58.]

13. The act is valid and a law to the United States courts, if it direct the surrender of fugitives from justice in cases not named in the treaty.

14. This commissioner, by his appointment by this court in October term, 1850, was a commissioner authorised to take cognisance of the case, under the act of August 12, 1848. The statute empowers him to act upon complaint on oath, and does not exact any requisition. The return and accompanying documents show that the case was brought legally within the jurisdiction of the commissioner, and that there was probable cause for committing the prisoner.

[Cited in Re Macdonnell, Case No. 8,772.]

15. This court has no authority to reverse the decision of the commissioner for error or irregularity, nor to determine the credit or weight of the evidence on which he acted.

[Cited in Re Henrich, Case No. 6,369; Re Macdonnell, Id. 8,772; Re Stupp, Id. 13,-563.]

16. The case is not bailable, and the prisoner not being entitled to a discharge, must be remanded to the custody of the marshal.

On the 1st day of July, inst., a habeas corpus was allowed by the United States district judge, directing the marshal to have the body of Thomas Kaine, by him imprisoned and detained, as it is said, with the cause of such imprisonment and detention, before the United States circuit court for the Southern district of New York, forthwith to do and receive, &c., &c. On the same day, the marshal returned the writ into court, stating that he held and detained the prisoner by virtue of a warrant and commitment, copies of which were annexed to the writ, and that he also produced the original thereof in court. The first was a warrant bearing date the 15th of June last past, issued under the hand and seal of Joseph Bridgham, of the tenor following: "The President of the United States of America. To the Marshal of the United States for the Southern District of New York, and to His Deputies, and to Any or Either

of them. Whereas, under just suspicions, complaint hath been made under the treaty between the United States and her majesty the queen of Great Britain and Ireland, concluded and signed at Washington, on the 9th day of August, 1842, on oath before me, the undersigned, Joseph Bridgham, Esq., one of the commissioners appointed by the circuit court of the United States, for the Southern district of New York (a magistrate), that one Thomas Kane, or Kaine, or Cain, then of Coolen, in the county of·Westmeath, in that part of the dominions of the said queen, called Ireland, did, on or about the fifth day of April, in the year one thousand eight hundred and fifty-one, at Coolen, aforesaid, and within the jurisdiction of the said queen, feloniously and maliciously fire a pistol, loaded with powder and lead, at one James Balfe, with the intent to murder him, and thereby, then and there, did wound the said James Balfe. And that the said Thomas Kane, or Kaine, or Cain, is a fugitive from justice in relation thereto, and is now somewhere within the jurisdiction of the United States court for the Southern district of New York. We, therefore, command you forthwith to take the said Thomas Kane, or Kaine, or Cain, and bring him before me, the said commissioner, or any other magistrate, to the end that the evidence of criminality may be heard and determined, pursuant to the treaty aforesaid. Witness my hand and seal, this fifteenth day of June, in the year one thousand eight hundred and fifty-two, and of the independence of the United States of America the seventy-sixth. (Signed) Joseph Bridgham, United States Commissioner for the Southern District of New York. (L. S.) Charles Edwards, Attorney, New York." The second was a commitment under the hand and seal of the same officer, bearing date, June 17, 1852, as follows: "June 17, 1852, committed for examination. Joseph Bridgham, U. S. Commissioner,"—and afterwards a commitment, bearing date June 29, 1852, of the tenor following: "United States of America. Southern District of New York, ss.—In the Matter of Thomas Kaine. This case having been heard before me, on requisition, through Anthony Barclay, Esq., her Britannic majesty's consul at the port of New York, that the said Kaine be committed for the purpose of being delivered up as a fugitive from justice, pursuant to the provisions of the treaty made between the United States and Great Britain, August 9, 1842, I find and adjudge that the evidence produced against the said Kaine is sufficient in law to justify his commitment on the charge of assault with intent to commit murder, had the crime been committed within the United States. Wherefore, I order that the said Thomas Kaine be committed, pursuant to the provisions of the said treaty, to abide the order of the president of the United States in the premises. Given under my hand and seal at the city of New York, this 29th day of June, 1842. (Signed) Joseph Bridgham, Unit-

ed States Commissioner for the Southern District of New York. (L. S.) Directed to the Marshal of the Southern District of New York."

Brady, Busteed & Emmet, for prisoner, claimed his discharge from arrest.

C. Edwards, in support of his commitment, moved that the writ of habeas corpus be discharged. He took two grounds of exception to the competency of the judge: First, that he had no authority to order the habeas corpus returned into the circuit court, or to act solely in that court, and adjudicate upon the subject; and, second, that, whether the prisoner was rightfully imprisoned and detained, in this case, were questions submitted by the law of the land to the determination of the president of the United States, exclusive of the judiciary.

THE COURT directed these points, if insisted upon, to be argued with the main questions in the case.

Mr. Brady moved for leave to traverse the marshal's return, and to that end offered to file a traverse of the tenor following: "On habeas corpus traverse: Thomas Kaine traverses the return made by the marshal of the United States, and states that there has been no requisition made by the British on the American government for the surrender of said Kaine. That Joseph Bridgham, Esq., by whom he was directed to be arrested and has been committed, is not a magistrate within the meaning of the treaty, under which said Bridgham professes to have acted, nor was he ever duly appointed or authorized to take cognizance of the proceedings against said Kaine. And the said Kaine further states that no legal evidence was adduced to said Bridgham to show that said Kaine could be lawfully demanded or surrendered under the treaty above mentioned, or was ever guilty of any offense designated or included in that treaty. And the said Kaine insists that neither the warrant nor commitment issued by said Bridgham, shows facts establishing any jurisdiction in him over the person or liberty of said Kaine. Dated July 1st, 1852."—and to produce the evidence, oral and documentary, which had been presented to the commissioner on the hearing of the application before him.

BETTS, District Judge. It was assented on both sides that the evidence before the commissioner, and the traverse offered at the hearing, should be considered as provisionally before the court, to enable the parties to discuss the legal relevancy and effect of these particulars, and, also, that it might be determined, if important to the merits of the case, in what manner and to what extent the prisoner might re-examine the decision of the committing officer. The papers were received, however, with express notice to the counsel on both sides that the court would hear no argument upon the question of the guilt or innocence of the prisoner of the crime

charged against him, nor upon the policy or propriety of his extradition from this country to England. In this posture of the debates there could be no occasion for the excited temperament of the auditories which thronged the court during the period of the argument, and it is to be deplored that the manifestations with the crowd to resist the detention of the prisoner, should be such that the marshal reported to the court he could not venture to remove him from prison, in obedience to the writ, without the aid of an armed force. The personal attendance of the prisoner was not indispensable, nor was it deemed so important as to warrant the hazard of the consequences which might attend his production in court with the writ, the danger not being that he would be concealed or subtracted from the command of the writ by the power which caused his arrest, but, on the contrary, that he would be rescued from the custody of the law by a mob.

The points upon which most stress was laid in the argument, were, first, the preliminary objections in support of the arrest,—that a district judge of the United States has no power to hold a circuit court; that he cannot order a writ of habeas corpus allowed before him, to be returned in the circuit court; and that, under the treaty with Great Britain and the act of congress of August 12, 1848, power is conferred upon the executive department solely, to determine whether a prisoner arrested as a fugitive from justice shall be delivered back to the country from which he escaped, and that the judiciary have no cognisance of the subject. I do not propose an extended consideration of these propositions. The circuit court is composed of a justice of the supreme court and a judge of a district court, and authority is given to each of these judges to hold the court in the absence of the other. Thus far, congress has legislated directly and explicitly. 1 Stat. 74, § 4; Id. 333, § 1; 2 Stat. 157, § 4; 5 Stat. 676, § 2. The term "absence," in the statute, is not limited to temporary omissions to attend court by a circuit judge. A district judge holds the circuit court with full powers, except voting on his own decisions removed by appeal or writ of error, in case the office of circuit judge be vacant by death or otherwise. Pollard v. Dwight, 4 Cranch [8 U. S.] 421; U. S. v. Lancaster, 5 Wheat. [18 U. S.] 434; Barry v. Mercein, 2 How. [43 U. S.] 65. The last case was one of habeas corpus, arising in this district. The supreme court was applied to, after the death of Judge Thompson, to allow the writ, because the circuit judgeship was vacant. The court decided that the death of the circuit judge did not affect the powers of the court, which could be held the same as if presided in by a justice of the supreme court. There seems, therefore, to be no legal ground to question the competency of the court holden by a district judge alone to exercise all the powers of a circuit court, under a writ of habeas corpus. (2)

The judiciary act (section 14) gives power to the justices of the supreme court and the several district judges to award writs of habeas corpus for the purpose of inquiring into the causes of commitment; but does not in the same clause and connection confer that authority on the courts themselves. This gave occasion to a doubt whether the power was vested in any of the courts; but at an early day the supreme court decided that all courts of the United States had, under the statute, power to issue that particular writ. [Ex parte Bollman] 4 Cranch. [8 U. S.] 75, 979. And that construction has since been carried into execution by that court and the various circuit courts. Watkins' Case, 3 Pet. [28 U. S.] 202; Id., 7 Pet. [32 U. S.] 568; Kerney's Case. 7 Wheat. [20 U. S.] 38; Johnson v. U. S. [Case No. 7,418]; Ex parte Smith [Id. 12,968]. And after it is awarded it carries with it the properties of the writ at common law. [Ex parte Bollman] 4 Cranch [8 U. S.] 75; Watkins' Case [supra]. In this view of the subject it is unimportant whether the writ issues in aid of an appellate power of the court, or by its original authority, inasmuch as it is a process which may emanate directly from a court, and is not simply the warrant of an individual magistrate. The court having power to grant the writ and act upon its return, the judge who awards it at chambers may make it returnable in court, instead of before himself personally. 3 Bl. Comm. 131. The circuit court being at the time in session, and held by the district judge, this course was taken to help obviate a supposed difficulty in removing a proceeding from before a judge at chambers to the supreme court.

I am not satisfied that in the present instance there would be any difference available to either party to have the proceedings conducted by the judge in one of the United States court rooms, in preference to the other; and indeed, to all general intents, the judge may be regarded, in the transaction of official business at chambers, to be acting as a court. Foote v. Silsby [Case No. 4,917]. I can perceive no ground on which to rest an objection to the authority of the judiciary to inquire, through a writ of habeas corpus, into the cause of commitment, in case of arrest of fugitives from justice, on application made under the treaty between the United States and Great Britain. A stipulation in the treaty prohibiting such jurisdiction, equally with a like enactment in a statute, would be void, as in opposition to the constitution. The treaty-making power of congress is not competent to suspend the writ of habeas corpus in time of peace. The provision in the treaty or act of 1848, respecting the functions of the executive in the matter, are not to be understood as giving the executive an appellate or controlling power over the judiciary; but if they imply a right in that department to withhold the delivery of a fugitive, after it shall have been in the manner pointed out by the treaty and act of congress, certified by a magistrate that the evidence of criminality is sufficient to sustain the charge against him, those provisions must be understood as having relation to a political power, and not a judicial one. Reasons of policy, and no doubt newly-discovered facts in respect to the criminality of the accused, may induce the president to refuse the extradition; but the possession of a power so to do in no way imports one in him to revise and rectify the proceedings before the magistrate, in the character of a tribunal of appeal or error. The power of the courts and judicial officers of the United States to inquire into the cause of a commitment, purporting to be made under treaty authority, is no way subordinate to or dependent upon the executive department; and this objection to the jurisdiction of the circuit court or district judge, singly, in that capacity, must be overruled.

The exceptions presented on the part of the prisoner are to the authority of the commissioner to arrest or commit the prisoner; to his jurisdiction over the subject matter; and in the legality and sufficiency of the proofs upon which he ordered the commitment. These have been the main topics of argument on this protracted hearing. It was my duty to give the arguments a deliberate consideration; but in determining the case, I do not deem it necessary to examine at large the propositions discussed by counsel, or spread out in full detail the reasons which govern my decision. In my judgment, the supervision of the court is limited to two general considerations—First, the competency of the committing magistrate to act at all; and, second, his jurisdiction over the case made by the facts in proof; for if he be a legally appointed magistrate, and the matter of accusation pertained to his jurisdiction, this court, in my opinion, has no other authority by way of habeas corpus than to ascertain whether the evidence of these facts was legally admissible, for it cannot correct or regard either error or irregularity of the officer in conducting the proceedings, or in his final determination. These positions will be succinctly developed, with reference to the principles and authorities upon which they are based. But as notice will be taken of matters not strictly within these points, it is proper to advert to the manner in which the case is presented on both sides. On the part of the plaintiff, right is claimed to file a formal traverse to the return. and offer issue upon averments that no requisition has been made by the British on the American government for the surrender of the prisoner; that the commissioner who directed his arrest is not a magistrate within the meaning of the treaty, and was never duly appointed or authorised to take cognizance of the proceedings against the prisoner. under the statute; that no legal evidence was adduced to the commissioner to show that the prisoner could be lawfully demanded or surrendered under

the treaty, or that he was guilty of any offence described in the treaty.

There is no statutory direction given the courts or officers of the United States as to the method of procedure on writs of habeas corpus other than in the act of August 12, 1848, which will be noticed particularly hereafter. The act of 31st Car. II. may be referred to for a description of causes of detention against which relief is afforded by the writ (Watkins' Cases, 3 Pet. [28 U. S.] 202), and if it might also supply a fitting rule of practice, there is no privilege given a prisoner by it to controvert the return to a habeas corpus by pending or otherwise. The act of 56 Geo. III. authorizes the officer or court to examine into the cause of commitment and the truth of the facts alleged on the return, but it is confined to cases other than of a criminal character. The statutes of this state, and various other states of the Union, adopt similar regulations in criminal cases (2 Kent, Comm. 28, and note), but none of those acts govern courts of the United States. The proceedings here must accordingly be in conformity with the rules of the common law, and they deny a prisoner the right to traverse the return to a writ of habeas corpus, or demand an issue on the legality of his commitment. Bac. Abr. "Habeas Corpus," bk. 2; Ing. Hab. Corp. 15, 16; 1 Hill, 659, 650, Cowen's notes. The paper offered with that object cannot therefore be received or acted on by the court as a pleading in the case. Still the prisoner has substantially the same protection he could expect by way of pleading, because he is allowed to prove on the return of the writ; by the return itself or evidence aliunde, that the committing magistrate had no authority to act in the matter, or that there was no legal evidence submitted to him, which tended to criminate the accused. Buford's Case, 3 Cranch [7 U. S.] 453; Bollman and Swartwout's Case, 4 Cranch [8 U. S.] 134; Metzger's Case, 5 How. [46 U. S.] 176. The first objection to the competency of the commissioner is that he is not an officer named and empowered by the treaty nor the act of congress to arrest a fugitive from justice or order his commitment, or if he is comprehended within the denomination of officers referred to by the treaty, the treaty of itself gives him no authority to act in execution of its provisions, and the act of congress affords no aid in that respect, not being adapted to carrying them into effect; and if the descriptions in the act of congress may be understood as applying to the commissioner, yet the whole act is void because not in consonance with the treaty, but on the contrary contemplates and provides for subjects out of the purview of the treaty compact. Although these objections were dwelt upon with great fulness and earnestness on the argument, I do not deem it necessary to discuss them in any considerable detail. The treaty arrange-

ments are brought into the discussion in so many points of view, that it will tend to give clearness to the subject, to set forth the tenth article, by which "it is agreed that the United States and her Britannic majesty shall, upon mutual requisitions by them, or their ministers, officers or authorities, respectively made, deliver up to justice all persons who being charged with the crime of murder, or assault with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged paper, committed within the jurisdiction of either, shall seek an asylum or shall be found within the territories of the other; provided that this shall only be done upon such evidence of criminality, as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offence had there been committed; and the respective judges and other magistrates of the two governments shall have power, jurisdiction, and authority upon complaint made under oath, to issue a warrant for the apprehension of the fugitive or person so charged, that he may be brought before such judges or other magistrates, respectively, to the end that evidence of criminality may be heard and considered; and if, on such hearing, the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the proper executive authority, that a warrant may issue for the surrender of such fugitive. The expense of such apprehension and delivery shall be borne and defrayed by the party who makes the requisition and receives the fugitive." 8 Stat. 576. The commissioner who performed the services in question was appointed to that office by the circuit court of this district in October term, 1850, by virtue of several acts of congress relating to the subject; and by act of August 23, 1842 (5 Stat. 516, § 1), that class of commissioners were authorized to "exercise all the powers that any justice of the peace or other magistrate of any of the United States may now exercise in respect to offenders, for any crime or offence against the United States, by arresting, imprisoning," etc. The act of appointment authorizes the commissioners designated to take affidavits in civil causes depending in the courts of the United States, and to execute all the powers and perform all the duties authorized or conferred by the acts of congress, entitled, etc. (enumerating several acts by their titles), "or any other act of congress having relation to such commissioners in their duties or powers." Minutes of the United States Circuit Court, January 2, 1851, of October term, 1850, 1 Blatchf. Append. The thirty-third section of the judiciary act enacts, that for any crime or offence against the United States, the offender may, by any justice or judge of the United States, or by any justice of the peace, or

other magistrate of any of the United States where he may be found, etc., be arrested and imprisoned, etc. 1 Stat. 91. A commissioner in this mode, acquiring all the powers of a justice of the peace or state magistrate in the arrest and commitment of offenders under the laws of the United States, becomes by such functions himself a magistrate. The appellation is one of widest significancy, embracing every functionary, from the chief of the government to the lowest subaltern concerned in carrying the laws into execution. Webst. Dict.; 1 Black, J. P. 248, 356, 357; Burn. Justice Voce; Sims' Case, [7 Cush. 285] Sup. Ct. Mass. April, 1851. The duties imposed on this class of officers by the acts of congress referred to accordingly constitute them magistrates within the manifest import of the treaty.

The act of congress of August 12, 1848, gives to United States and state judges and certain commissioners powers to execute treaty stipulations in this respect, but omits the term "magistrates," and accordingly, if this commissioner does not come within the character of those specified by the statute, he has no authority in this case except that imparted by the treaty. The position of the officer presents two considerations — First, whether, in his character of magistrate, he can take and employ any powers created by the statute for the purpose of carrying the treaty into effect; and, second, whether he can proceed under the treaty itself, and perform the duties therein enjoined upon him, independent of the statutory provision. Inverting the order of these inquiries, I have no difficulty in declaring that the treaty, without any aid of legislation by congress, is a law addressed to courts and judicial officers, and furnishes all adequate authority for its own execution. This proposition I regard as definitely settled by the adjudications of the supreme court, independent of the imperative language of the constitution. U. S. v. The Peggy. 1 Cranch [5 U. S.] 109, 110; Foster v. Neilson, 2 Pet. [27 U. S.] 314. In the first case, the court says, "Where a treaty is the law of the land, and as such affects the rights of parties litigating in courts, that treaty as much binds those rights, and is as much to be regarded by the court, as an act of congress." In the other, the court says, "Our constitution declares a treaty to be the law of the land. It is consequently to be regarded in courts of justice as equivalent to an act of the legislature, whenever it acts of itself, without the aid of any legislative provision." In re Metzger [Case No. 9,511], and cases cited. In a more recent case, in which a fugitive from justice was arrested in this country by a warrant of an United States judge, under the French convention, appeal was made to the supreme court for a habeas corpus, to discharge the prisoner; and the counsel grounded himself in his argument on the position that the courts of the United States, and the judges of those courts can

exercise no powers of a judicial character, and can possess no jurisdiction except that which is conferred upon them under the authority of the constitution, by act of congress; and, in pressing his argument, the counsel urged it as a conclusive consideration that the only ground upon which the claim of jurisdiction was rested, before and by the district judge, is that of the treaty stipulations with France, and the means by which he acquired jurisdiction on application addressed to him by the diplomatic agent of the French government. The attorney general, in his reply, discussed this position; so that the point was brought directly to the notice of the court. The court, in delivering their opinion in the case, commenced by reciting the provisions of the treaty, and adverting to the objection "that the treaty, without the aid of legislation, does not authorize an arrest of a fugitive from France, however clearly the crime may be proved against him; that the treaty provides for a surrender by the executive only, and not through the instrumentality of the judicial power," answered that "the mode adopted by the executive, in the present case, seems to be the proper one. Under the provisions of the constitution, the treaty is the supreme law of the land, and in regard to rights and responsibilities growing out of it, it may become a subject of judicial cognisance. The surrender of fugitives from justice is a matter of conventional arrangement between states, as no such obligation is imposed by the law of nations. Whether the crime charged is sufficiently proved, and comes within the treaty, are matters for judicial decision; and the executive, when the late demand of the surrender of Metzger was made, very properly, as we suppose, referred it to the judgment of a judicial officer. The arrest which followed, and the committal of the accused, subject to the order of the executive, seems to be the most appropriate, if not the only mode of giving effect to the treaty." Metzger's Case, 5 How. [46 U. S.] 176.

I find no authority controverting the rule laid down by the supreme court in the above decisions, other than a decision by a state magistrate, in the Case of Metzger, on habeas corpus, discharging him from the warrant issued by the president for his extradition, and setting him at liberty, because the United States judge had no jurisdiction in the matter, under the treaty, without the aid of an act of congress. This decision was placed upon the authority of a judgment rendered in England by a court of sessions, on the effect of an English treaty, and what gives the more remarkable aspect to the interference and conclusions of the state judge is, that his opinion was pronounced after the decision of the supreme court, and with that case before him. Metzger's Case [supra]. Considering the proceedings before the commissioner as taken under the authority of the treaty alone, it appears to me the return

shows enough to give him jurisdiction of the case. Complaint was made to the commissioner, under oath, that the prisoner had committed an assault, with intent to murder one James Balfe, in Ireland, and had fled from justice there to the United States, and was then within this district, and praying his arrest under the treaty. The commissioner issued a warrant under which the prisoner was arrested on that charge, on the 15th of June last, and on the 29th of the same month, he issued and delivered to the marshal, a warrant or order to the following tenor: "In the Matter of Thomas Kaine. This case having been heard before me, on requisition through Anthony Barclay, Esq., her Britannic majesty's consul at the port of New York, that the said Kaine be committed for the purpose of being delivered as a fugitive from justice, pursuant to the provisions of the treaty made between the United States and Great Britain, August 9, 1842, I find and adjudge that the evidence produced against the said Kaine is sufficient in law to justify his commitment on the charge of assault with intent to commit murder, had the crime been committed within the United States. Wherefore, I order that the said Thomas Kaine be committed, pursuant to the provisions of the said treaty, to abide the order of the president of the United States in the premises. Given under my hand and seal," etc. No evidence contradicting the averments in these warrants, is produced on the part of the prisoner; but the original evidence upon which the commissioner acted is, by consent of both parties, laid before the court, and the fact that such requisition and complaint on oath, and the further fact that other evidence to prove the commission of the crime in Ireland, by the prisoner, was produced on the hearing, is indisputably established.

The treaty does not, as is supposed by the counsel for the prisoner, provide that the requisition for the arrest of a fugitive shall be made by one government to the other. It will bear the interpretation that the first application may be made by complaint on oath, to a judge or magistrate, without the intervention of either nation. The act of August 12, 1848, most plainly signifies that congress so understood the obligations of the treaty on our part, and means it shall be executed in that sense. But if, to initiate the jurisdiction of a magistrate under the treaty, it be necessary, that a requisition be made for the arrest and commitment of a fugitive, I am of opinion the application in that behalf of a resident consul sufficiently satisfies the terms of the treaty, he being by the common usage of nations, the agent of his government in municipal matters, not strictly of a diplomatic character (Vatt. Law Nat. bk. 2, § 34; 1 Kent, Comm. 42; Wheat. Int. Law, p. 168, § 11; Henshaw, Manual of Consuls, 21, 22), and in that sense may be regarded an officer or proper authority within the contemplation of the treaty; and it is to be observed that the act of congress gives jurisdiction of the subject to judge and commissioners without allusion to any requisition preceding or accompanying the complaint on oath. The same remark applies to the manner in which magistrates are authorized to act by the treaty, in the arrest and commitment of the fugitive; and the mutual requisitions spoken of by it, would therefore seem confined to the demand of the criminal to be delivered up. This being an executive act, would properly be claimed by a diplomatic requisition addressed to the government. No doubt, in general practice, a call on the government either precedes the application to a magistrate to arrest and detain the supposed fugitive, or is concurrent with it. Still I think the terms of the treaty are satisfied, if the competent ministers, officers, and authorities of Great Britain, prefer their application, under the treaty, in the first instance to a judge or magistrate; and that the judge or magistrate may therefore take action in the matter, without any communication with his own government. There being no evidence to this particular, other than the return and the requisition addressed by her Britannic majesty's consul to the commissioner, it is to be assumed that the United States government had given no instruction or request that the subject should be acted upon by a judicial officer here; yet in my opinion, the authority of the commissioner to take cognisance of it, on the application to him, was complete by force of the treaty.

Another jurisdictional fact must, however, be established before the commissioner acquires full authority to adjudge in the case, although the subject matter be within his general jurisdiction as the proper magistrate to hear it, and that is, evidence that the crime pointed out by the treaty had been committed. The proceedings before the magistrate are to be regarded as now before the court, to the same effect as if brought there by certiorari; and, in inquiring into the cause of commitment, the court must see that there is probable cause to believe the prisoner committed the offence charged against him. U. S. v. Burr, 4 Dall. [4 U. S.] 413; 1 Burr, Court Trial, 11, 97. Hence, this writ on habeas corpus will do no more than determine whether there was legal evidence upon the face of the papers conducing to prove such probable cause. It belongs to the magistrate to decide upon the credibility and effect of the testimony, and his decisions cannot be revised here. Bennac's Case, 4 Barb. 35. The form of the proof is not so material on an application to answer and commit, as on a trial; because any magistrate may commit on an affidavit taken before another. Bollman and Swartwout's Case, 4 Cranch [8 U. S.] 128, 129. And even if the evidence on the arrest and commitment of the accused, was wholly irregular and insufficient to au-

thorize the detention of the prisoner, the court will not discharge him on habeas corpus, if on looking into the case, they find probable cause for detaining him, but will bail or remand him at discretion. 1 Chit. Cr. Law, 129. The original deposition and information proving the crime was not produced. A certified and sworn copy was given in evidence. This is not competent proof at common law, and unless the provisions of the act of congress authorizing inferior evidence may be resorted to when the proceedings are instituted under the treaty alone, there would be no legal evidence tending to charge the crime upon the prisoner. There is some technical difficulty in appropriating the provisions of the act to a proceeding wholly under the treaty, as the present must be if the commissioner is not an officer empowered by the statute to take cognisance of the matter, inasmuch as the wording of the second section seems to import that the mode of proof authorised thereby is limited to the particular offenses named by the statute. "In every case of complaint as aforesaid," are the terms of reference connecting the subject matter of the two sections, and should be understood, in the absence of all other evidence of the intention of congress, as restricting the statutory proof to a proceeding under the statute. The title to the act denotes a broader purpose, and that the statute was not enacted with a view to communicate jurisdiction to the various judges and commissioners therein referred to, but to aid and amplify the powers derived by them from the treaty. It is "An act for giving effect to certain treaty stipulations between this and foreign governments, for the apprehension and delivering up of certain offenders." This language plainly signifies that the legislature intended to supply an auxiliary to the treaty stipulations, and there being nothing in the enactment of the second section necessarily confining its operation to a proceeding before the officers named in the first, it would be giving no more than reasonable effect to it, to consider the method of proof thereby authorised as alike applicable to a complaint made directly under the treaty. The terms of the section are: "That in every complaint as aforesaid, and of a hearing upon the return of the warrant of arrest, copies of the deposition upon which an original warrant in any such foreign country may have been granted, certified under the hand of the person or persons issuing such warrant, and attested upon the oath of the party producing them, to be true copies of the original depositions, may be received in evidence of the criminality of the person so apprehended." The authenticating evidence in this case was prima facie sufficient to justify the commissioner receiving the complaint and deposition, and that, with the corroborative evidence produced, was pertinent to prove the crime charged, and that it was committed by the prisoner, and this court has no capacity in law to decide that the magistrate determined these points erroneously. This doctrine is fully sanctioned by the supreme court of this state, when the habeas corpus is issued under the state statute. Bennac's Case, 4 Barb. 35. In my opinion, accordingly, the habeas corpus must be dismissed, even if the commissioner had no jurisdiction in the matter other than what he derived from the treaty, because nothing was done before him in any way conflicting with the directions of the statute, and because the provisions of the second section of the act apply as well to a magistrate acting under a treaty as to the officers designated by the statute, and give to the copy of the original deposition the same effect as the original would have had in law if made in this country. But, in my opinion, the commissioner comes also under the description of officers named in the act, and all the proceedings before him were fairly within its purview.

Before stating the reasons for this conclusion, it is proper to advert to an objection raised on the part of the prisoner, that congress, in the enactment of the statute, has gone out of and beyond the stipulations of the treaty, and the treaty being the supreme law of the land, the statute becomes thus nugatory and void. I am not able to discover such discordance between the two laws as that one must necessarily displace the other; on the contrary, I think they substantially coincide in those particulars upon which both operate, and that the differences between the two are no more than that the legislature has extended its enactments beyond the provisions of the treaty. The inquiry, consequently, is not which authority must prevail, if both cannot be executed, but whether congress is debarred by the existence of a treaty from adopting new and more enlarged regulations upon the topics embraced within the treaty compact. The legislation, it is to be observed, is wholly domestic and infra-territorial, and does not assume to interdict or diminish the engagements of the treaty. It would seem that this statement of the action of congress would of itself supply an answer to the objection. It is incontestably within the competency, and at the discretion of congress, to provide by law for the extradition of criminals escaping from foreign countries to this, without regard to any reciprocal obligations on the part of the home country of the fugitive towards us. This is entirely a matter of domestic policy. The provision may be merely to expel them from our territories, or to re-convey them to the country from which they fled, as may be most consonant with our security or interests; and no one can question the right of the government to enforce such a law within our own dominions. Had this statute directed the delivery up, on requisition, or the expulsion without demand, of British subjects, guilty of other

crimes committed abroad than those enumerated in the treaty, no well grounded objection, in my judgment, could be taken to the validity of the law. Whether, then, the act of August 12, 1848, be regarded as merely auxiliary to the treaty, or a substantive law taking effect independently of any treaty compact, the powers imparted and the directions given by it would be of like obligation and effect in the federal court. The point now under consideration can only be of moment in case the commissioner who acted in this matter is not an officer named in the law, for if the description in the statute embraces this officer, then all foundation for the objection is removed, as he is clothed with all the powers conferred by the act. The enactment is: "It shall and may be lawful for any of the justices of the supreme court, or judges of the several district courts of the United States and the judges of the several state courts, and the commissioners authorised so to do by any of the courts of the United States, are hereby severally vested with power, jurisdiction, and authority upon complaint made on oath," etc.; and the sixth section provides "that it shall be lawful for the courts of the United States or any of them, to authorise any person or persons to act as commissioner or commissioners under the provisions of this act; and the doings of such person or persons so authorised, in pursuance of any of the provisions aforesaid, shall be good and available to all intents and purposes whatever." The enactments taken together empower commissioners already in office to execute the act when authorised so to do by any of the courts in the United States, as also such commissioner or commissioners as may be specially designated and appointed by such courts to that particular service. The difference between the act and treaty in this particular consists in substituting for "magistrates," named in the latter, "commissioners," referred to in the former; and accordingly, instead of all magistrates of the general and state governments being employed by the legislature to perform the service, the authority is limited to judges as a portion of that generic class; and commissioners of the United States courts, in their capacity of magistrates solely, would be excluded from jurisdiction under the act. They must be authorised to take cognisance of the subject, by some court of the United States (section 1), or be specifically appointed to that duty (section 6), to constitute them the officers described by the act.

I think the rule of the circuit court for this district adopted in October term, 1850, and entered upon the minutes of the court, January 21, 1851, fulfils either or both requirements of the law. That rule designates and appoints various ex officio persons (of whom the commissioner in this case was one) commissioners to execute all the powers and to perform all the duties authorised and empowered by any act of congress having relation to such commissioners, or their duties or powers. The same rule in substance had been in force within this district since 1838, and the commissioners by virtue of such appointment had performed the duties of judges and magistrates in criminal matters subsequent to the act of August 23, 1842, and notoriously superseded, in that respect, the employment of state judges and magistrates; and except in capital cases of extraordinary importance, they relieved the United States judge of that duty also in this district. It is believed such was the case pretty universally throughout the United States and that persons accused of crimes against the United States were arrested, examined, committed, or bailed by this class of officers; and no other standing commissioners are known to the practice of the United States courts, or are authorised by its laws to be appointed by the courts. In 1842, congress had conferred criminal jurisdiction on these officers. It is obvious, from the first section of the act of 1848, that a class of commissioners being in office, and exercising similar powers with those then conferred, were in the contemplation of congress; and it would be giving no more than the ordinary effect to the language of the first section, to understand it as applying to commissioners so appointed by the circuit courts, or district courts exercising circuit court powers, as to be authorised to take cognisance of criminal accusations. In this aspect of the subject, there might be fair room to question whether any new action of the courts could be requisite to authorise such commissioners to take proceedings under the act of 1848. They might be reasonably intended to be so authorised by virtue of the plenary powers conferred by their original appointment, or even by the mere fact of being appointed, because the jurisdiction in matters of a criminal character enlarged or varied from time to time by congress, might well be regarded as incident to their office.

This topic need not, however, be pursued, inasmuch as the circuit court of this district, after the passage of the act of August 12, 1848, republished the standing order of appointment, with additions and alterations, not diminishing any way the powers the commissioners previously had, but manifestly designed to confer on them jurisdiction in all cases within the competency of the court to grant. The language of the appointment appears to have been studiously chosen, with a view to give those officers a capacity to act in any matter which, by appointment of any existing act of congress, appertained to commissioners created by the court. I can perceive no reason to question that the order of 1850 authorises the commissioners in office to do every act in that capacity which the court could empower them to perform, and is a full execution of the authority given the court by the first and sixth sections of the

act of 1848, as completely such as if the act had been recited in the order of the court. If, under any reasonable rules of construction, the sixth section of the act of 1848 might be held to require an appointment of commissioners to act under the treaties referred to, toties quoties, as the particular cases occur, I suppose it might still be an adequate fulfilment of that requirement to designate by a standing order those commissioners, or any one of them, as the commissioner to that end, and such permanent designation would be no less efficacious than if reiterated on the happening of every case calling for his action. But it is needless to theorize on that subject. Comparing the order of the court with the terms of the statute, I am of opinion that the commissioner in this instance was authorised to take cognizance of the case under the statute, and that there was produced before him legal evidence to prove all the facts necessary to the exercise of his jurisdiction over the case; and the evidence, it appears to me, showed at least probable cause. for the arrest of the prisoner. His offence not being bailable here, the court has no power in such case other than to remand him under his original commitment. Whether the proofs were produced solely under the authority of the treaty or that of the statute, I hold the commissioner to be clothed with competent authority, and having also jurisdiction over the subject; and there being before him legal evidence tending to prove that the offence charged against the prisoner, and named in the treaty, was committed by him, the writ of habeas corpus allowed in this case must be discharged, and the prisoner be remanded to the custody of the marshal, under the commitment of the commissioner..

[NOTE. On the 17th of July following this decision, the proceedings having been forwarded to the proper department at Washington, the acting secretary of state issued his warrant, directing that the prisoner be surrendered and delivered up to Anthony Barclay, the British consul at the port of New York. At this stage of the proceedings an application was made to chambers to Circuit Justice Nelson for a writ of habeas corpus to bring up the prisoner upon an alleged illegal detention and imprisonment, which application was refused until the whole of the proceedings that had taken place before the commissioner and before Judge Betts in the circuit court should be laid before him. This was done, and the learned justice expressed the opinion that the commissioner possessed no jurisdiction over the case, and that the proceedings were in other respects irregular and not warranted in law. But, instead of discharging the prisoner, as he deemed the case of sufficient magnitude, and that the public interest justified the submission, he adjourned the case to the next term of the supreme court. Case No. 7,597a. The supreme court dismissed the adjourned case for want of jurisdiction. The case was, however, presented to the supreme court at the same time in another form. An application was made directly to it by the prisoner for a writ of habeas corpus. Mr. Justice Cathron delivered an opinion, denying the writ, and holding that the commissioner had jurisdiction, and that there was sufficient evidence before him to establish the official character of

the magistrate before whom Balfe's deposition was taken, and that the copy proved to be a true copy by Meagher was properly received. In this opinion Justices Wayne, McLean, and Grier concur. Mr. Justice Curtis, in a separate opinion filed by him, also favored denying the writ, upon the ground that, if issued, the court would have no jurisdiction to inquire into the cause of commitment shown by the petition. Mr. Justice Nelson delivered a dissenting opinion, which was concurred in by Mr. Chief Justice Taney and Mr. Justice Daniel. The questions involved failed to meet a judicial determination, in consequence of the diversity of opinion among the members of the court, but the majority concurred in denying the writ, which was done, and an order entered dismissing the petition. 14 How. (55 U. S.) 103. The adjourned case, having been dismissed by the supreme court, was subsequently heard by Justice Nelson in chambers, and, upon the question of want of jurisdiction of the commissioner, the prisoner was discharged. Case No. 7,-597.]