## Case No. 4,488.

In re ENGLE et al.

[1 Hughes, 592.][1]

Circuit Court, D. Maryland. Feb. 1877.

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

BOND, Circuit Judge. The facts in these cases important to their decision are within a very narrow compass. The statements made by the petitioners differ little from the statements made by the respondents respecting them. The petitioners were appointed special deputy marshals at the late election for representatives in congress, under section 2021, tit. 26, Rev. St. U. S. While in the performance of their duties as such deputies at the fourth precinct of the twentieth ward, in the city of Baltimore, they arrested two persons and took one of them before a United States commissioner, where he was immediately discharged on bail and returned to the poll. The other person arrested was taken to the chief marshal of the ward, where he was by him released. There was no unnecessary violence, or, indeed, any rough usage whatever used in making these arrests. If guilty at all, the special deputy marshals are guilty of a mere technical assault and battery. The one party arrested was charged with conduct at the poll tending to a breach of the peace, being intoxicated and noisy. The other was arrested for holding tickets having the heads of President Grant or the late President Lincoln thereon, which he was offering to approaching voters—these tickets having the name of the nominee of the Democratic party for congress printed on them, while the cuts indicated that they were Republican tickets. This was conceived to be an attempt to deceive the colored men there offering to poll, of which class of voters there was a large number in that ward who could not read. The special deputy marshals were charged with assault and battery by the parties whom they had arrested, before the proper state officers. Warrants were issued for them and, having been taken into custody, they filed petitions for writs of habeas corpus. These writs were issued, and the special deputy marshals were discharged on bail by the judge of the circuit court of the United States. The grand jury of the criminal court of Baltimore city subsequently indicted them for assault and battery and for intimidating voters, and being again arrested they were again released on habeas corpus on bail. The act for which the petitioners were first arrested and subsequently indicted, it was proved at the hearing and admitted in the argument, were simply the arrests made by them at the polls of the congressional election, while acting as deputy marshals as above stated.

This is a motion to quash the writs of habeas corpus so issued. Under this state of facts two questions arise which have been elaborately and well argued by the state's attorney of Baltimore city on the part of the respondents, and by the district attorney on the part

of the petitioners. The first is, are the acts of the 28th of February, 1871, and the amendments now contained in sections embraced under title 26 of the Revised Statutes, constitutional; and, more particularly, was it within the power of congress to enact section 2021 of the Revised Statutes, which provides for the appointment of special deputy marshals, to attend the election of representatives and delegates in congress; and section 2022, which defines the duties of such deputies, requiring them, among other things, to keep the peace and preserve order at the polls? And the second question is, supposing these questions to be constitutional, were the deputy marshals justified in arresting these parties for the causes above noted? Section 4 of the first article of the constitution of the United States provides that "the time, places, and manner of holding elections for senators and representatives shall be prescribed in each state by the legislature thereof, but the congress may, at any time by law, make or alter such regulations, except as to the places of choosing senators." Under this section of the constitution, the legislatures of the states for a long time proceeded by law to determine the time, places, and manner of choosing the representatives in congress, but by the act of the 2d of February, 1872 [17 Stat. 28], congress, in the exercise of its authority under this fourth section, provided by law the time of holding the election of representatives throughout the United States. The state legislatures had likewise provided the time and manner for the election of senators until congress, in the exercise of the same power, by the act of July 25th, 1866 [14 Stat. 243], determined by law the time and manner of the election of senators of the United States.

It will not, we suppose, be disputed that the clause of the constitution which in the same words grants power to two distinct bodies, must grant the same power to each, and that if, under section 4 of article 1 of the constitution of the United States above quoted, state legislatures have from the foundation of the government, and without objection, provided the judges and inspectors of elections for federal officers, and have determined that the vote shall be viva voce or by ballot, as they thought best, that the congress of the United States, under the same clause, may do the same thing. The constitution provides that there shall be a house of representatives, and further, that congress may regulate the manner of election of the members of it. An election, within the meaning of the constitution, is the result of the free expression of the choice of the electors at the time and place appointed by law, and the declaration of the result by those appointed for the purpose. The manner of an election is nothing more nor less than the mode of effecting this purpose. This includes the power to appoint the persons to hold it; for if the election is determined by law to be by ballot, they must be duly authorized to receive the vote. If it be viva voce there must be some one to record the names of those whom the electors announce as their choice. There must be some one to count the votes, else the choice of the electors could never be ascertained. The states prescribe the qualifications of the electors. To receive the votes of such qualified voters only, and to provide that all such qualified persons who offer to vote do so, is to hold an election. The mode of effecting this result is the manner of the election, which the states have all along regulated, and do in many particulars now regulate, but which regulation, to some extent, congress has itself undertaken to make and alter. But it is argued that even admitting the power of congress to appoint, as the states have heretofore done, the officers to conduct a congressional election, there is no power given to congress to appoint peace officers to keep the peace upon the soil of the states. Yet section 2022 provides that these marshals and deputies shall keep the peace and preserve order at the polls. To regulate the manner of an election is to provide the means by which each elector expresses his choice freely and without hindrance or obstruction. To say that the states may, under this provision of the fourth section, appoint judges of federal elections, designate the place where they shall sit during the day of the election, and that they cannot remove obstructions which on that day prevent the electors from reaching them, would be strange indeed. If the states can do so the congress may, for the same powers by the constitution are given to each, as to congressional elections. As an election, as we have above said, is the declared expression of the choice of the qualified electors, it is quite as necessary that no one but qualified electors should, as that they should themselves be able to do so. Hence the regulations respecting registration are a part of the manner of the election, for they furnish a method by which those who hold the poll may discriminate between qualified and disqualified voters.

The extent of the power given to the congress by this fourth section is readily seen from the reasons given for its adoption at the time of framing the constitution. Alexander Hamilton, in No. 59 of the Federalist, gives as a reason for its adoption, "that every government ought to contain in itself the means of its own preservation." According to his view, whatever was necessary to be done to enable the qualified voters of a state to freely express their choice for a representative in congress, the congress under the fourth section has a right to provide. If, by any reason of hostility, the state determined to destroy the federal government by preventing the election of representatives in congress, either by a law forbidding its citizens to vote for such representatives, or by failing to regulate the time, place, and manner of

such election, since the federal government could not exist without a house of representatives, the power was given to congress to make and alter such time, place, and manner. The federal government has as much right to exist since the adoption of the constitution which created it as the state governments have; whatever the latter may do to secure a full and free expression of the choice of state electors for candidates for state officers, the United States may do in respect to representatives in congress. Whether the hindrance or obstruction to a free expression of the choice of qualified electors for representatives in congress comes from an open act of hostility of the state or from the neglect to provide such a manner of election as to guard against such hindrance and obstruction, or from organized bands of its inhabitants conspiring together for the purpose, or from the act of one evil-disposed person only, the congress has the right, by virtue of the power given by this section, for the preservation of the national existence, which depends, as the life of all representative forms of government must, upon the freedom and purity of elections, to establish such regulations respecting the manner of conducting the election as will, in its judgment, prevent and remove them.

The marshal, therefore, and his special deputies were constitutionally charged with the duty of keeping the peace and of preserving order at the polls of this congressional election, and the question which arises is, were they justified, upon the facts, in arresting Anton Schlauch, who was charged with being intoxicated, turbulent, and noisy? We think the offence of Schlauch, even as stated by the deputy marshals, was but slight, but a large discretion must be given to an officer charged with the duty of keeping order at an election precinct. His duty is to prevent a disturbance as well as to suppress disorder after it has arisen, and as in this case the deputy used no harsh measures, and might well have supposed that the facts proved respecting the conduct of Schlauch would create a breach of the peace then, though at another time, at a place where there was less excitement, such conduct would have done no harm, and might have been passed over as the boisterous mirth of a jovial man excited by drink, yet the polling-place was not a proper place for its display. We are of opinion that the deputy was justified in his removal from the vicinity of the polling-place. The exercise of the elective franchise is not a frolic; it is the highest and most solemn duty of the citizen, and the deputy marshals appointed to keep the peace and preserve order at the time and place of its exercise will be sustained in preserving such a state of affairs at the polls as will enable the oldest, weakest, most infirm, or timid of the electors to perform that duty. But by section 2022 of the Revised Statutes, the marshal and his special deputies are not only charged with the duty of keeping the peace and preserving order, but they are to prevent fraudulent voting.

Harris, one of the parties arrested, was a colored man. He was holding tickets headed by the devices of the Republican ticket, with the names of the Democratic candidates imprinted on them, and offering them to the colored voters as they approached the poll. Many of the voters were colored men who could not read. They were guided in their knowledge of the ticket by the pictures upon them, and they were offered to them by one of their own color. To give an ignorant elector a ticket with this device was, if he desired to vote for the Republican and not the Democratic candidate, to deprive him of his vote and to put a vote in the box for the opposing candidate by fraud. The deputy, we think, was justified in removing this cheat from the vicinity of the polling-place, not only because he was directed to prevent fraudulent voting, but because had this trick been discovered by the opposing party, it might then have led to an attempt to take his tickets from him, and to a consequent breach of the peace. We have come to the conclusion that the act of congress under which these marshals and deputies were appointed is abundantly authorized by the fourth section of article 1 of the constitution of the United States, and that the conduct of the deputy marshals in the exercise of the powers conferred on them was both justifiable and discreet.

We shall refuse the motion to quash, and enter an order discharging the petitioners.