*In re* BROSNAHAN, Jr.[1]

*Circuit Court, W. D. Missouri, W. D.* June, 1883.)

1. HABEAS CORPUS—POWER OF FEDERAL COURTS—STATE CRIMINAL STATUTE.
    The circuit court of the United States may issue the writ of *habeas corpus* upon the application of any person who is imprisoned in violation of the constitution, or of any law or treaty of the United States; and if a person be imprisoned under a state statute which is in conflict with either, that court has power to discharge him.

2. STATE STATUTE HELD NOT IN VIOLATION OF THE CONSTITUTION OF THE UNITED STATES.
    The statute of Missouri providing for the punishment by fine and imprisonment of any person who shall manufacture, " out of any oleaginous substance, or any compounds of the same, other than that produced from unadulterated milk, or cream from the same, any article designed to take the place of butter or cheese produced from pure unadulterated milk, or cream of the same," or who shall sell or offer for sale the same as an article of food, is not in violation of any provision of the constitution of the United States.

3. PATENT LAWS—RIGHTS OF PATENTEE.
    The sole object and purpose of the patent laws is to give to the inventor a monopoly of what he has discovered. What is granted to him is the exclusive right, not the abstract right; but the right in him to the exclusion of everybody else. He is not authorized by the patent laws to manufacture and sell the patented article in violation of the laws of the state. His enjoyment of the right may be modified by the exigencies of the community to which he belongs, and regulated by laws which render it subservient to the general welfare, if held subject to state control.

4. PATENT—IN WHAT SENSE A CONTRACT.
    A patent is a contract only as between the parties to it, namely, the United States on one side and the patentee on the other, and the rights conferred thereby can extend no further than the right granted to the patentee under the patent laws.

5. REGULATION OF COMMERCE.
    The statute above mentioned is not a regulation of commerce among the several states.

6. DEPRIVATION OF LIBERTY OR PROPERTY — FOURTEENTH AMENDMENT TO THE CONSTITUTION.
    The statute above named does not deprive any person of liberty or property without due process of law, within the meaning of the fourteenth amendment to the constitution.

7. HABEAS CORPUS—JURISDICTION.
    The federal courts have no jurisdiction to discharge a prisoner held under a state statute, upon the ground that such statute is in violation of the constitution of the state, or in excess of the powers which the people of the state have conferred on their legislature. If it does not violate the federal constitution, the question is for the state courts.

[1] From the Colorado Law Reporter.

On Writ of *Habeas Corpus*.

MILLER, Justice. The prisoner in this case is brought before us by virtue of a writ of *habeas corpus* issued under the authority of this court, and directed to John W. Rucker, in whose custody the petitioner stated himself to be. To this writ Mr. Rucker, at the time of producing the body of his prisoner, makes return that he holds him˙ in custody by virtue of a precept to him directed as constable by A. W. Allen, a justice of the peace of Jackson county, Missouri, and he annexes a copy of the *mittimus* as a part of his return. From this it appears that a criminal proceeding had been instituted against Brosnahan for a violation of the statute of Missouri concerning the sale of oleomargarine, and that on being arrested and brought before the justice of the peace the latter had set the hearing or trial at some future day, several months off, and had fixed a reasonable sum as bail for the prisoner's appearance at that time. The prisoner refused to give bail, whereupon the magistrate made the order committing him to custody. The present writ of *habeas corpus* was thereupon sued out.

As the courts of the United States are of limited jurisdiction, and, in ordinary cases, can have no control of the courts or judicial officers of the states while engaged in enforcing their criminal laws, the counsel representing Rucker on behalf of the state deny the jurisdiction of this court in the case.

For the prisoner the jurisdiction is asserted on the following grounds:

*First*, that the statute of Missouri is void, because the article, oleomargarine, the sale of which it forbids in Missouri, is made and sold under a patent of the United States issued to Hyppolyte Mege, December 30, 1873, for a new and useful discovery under the patent laws on that subject; *second*, it is void because it impairs the obligation of the contract evidenced by that patent; *third*, it is void because it is a regulation of commerce among the several states; *fourth*, because it deprives a man of his property without due process of law, (section 1, art. 14, of the Amendments to the Constitution of the United States;) *fifth*, because it is without any authority in the constitution of the state of Missouri, and is outside of any legislative power whatever.

The statute thus assailed is in the following words:

"An act to prevent the manufacture and sale of oleaginous substances, or compounds of the same, in imitation of the pure dairy product.

"Section 1. Whoever manufactures, out of any oleaginous substances, or any compounds of the same, other than that produced from unadulterated milk, or cream from the same, any article designed to take the place of butter or cheese produced from pure, unadulterated milk, or cream of the same, or whoever shall sell or offer for sale the same as an article of food, shall, on conviction thereof, be confined in the county jail not exceeding one year, or fined not exceeding $1,000, or both." Approved March 24, 1881.

The acts of congress concerning the writ of *habeas corpus* have been brought together in chapter 13 of the Revised Statutes, and are included in sections 751–766.

That which relates to the jurisdiction of the circuit courts is found in sections 751 and 753:

"Sec. 751. The supreme court, and the circuit and district courts, shall have power to issue writs of *habeas corpus.*"

"Sec. 753. The writ of *habeas corpus* shall in no case extend to a prisoner in jail, unless when he is in custody under or by color of the authority of the United States, or is committed for trial before some court thereof, or is in custody for an act done or omitted in pursuance of the law of the United States, or of an order, process, or decree of a court or judge thereof, *or is in custody in violation of the constitution, or of a law or treaty of the United States,* or being a subject or citizen of a foreign state," etc.

The words italicized above, namely, "or is in custody in violation of the constitution, or of a law or treaty of the United States," confer the only power under which, in this case, jurisdiction can be exercised by the circuit court.

It is quite clear that if the Missouri statute is justly obnoxious to either of the four objections first named, it is void, and the person held for violating that statute is in custody in violation of the constitution of the United States; and the power and duty of this court to discharge him are unquestionable.

We proceed to inquire if the law is so objectionable.

1. As to the effect of the patent. The patent is introduced in evidence, and proof is offered to show that the article sold by the prisoner, and for which sale he is prosecuted, is the article specified in Mege's patent, and that the prisoner has such authority as the patent confers to sell it. The validity of the patent is not disputed. Has the prisoner, then, a right to sell the article thus patented, notwithstanding the statute of Missouri which forbids such sale? The constitution, (art. 1, § 8, cl. 8,) gives congress power "to promote the progress of science and useful arts by securing, for a limited time, to authors and inventors, the *exclusive right* to their respective writings and discoveries;" and the act of congress which is designed to give effect to this clause declares that in every case where a patent is issued under it, the patentee shall have the *exclusive right to make, use, and sell* the subject-matter of his patent, whatever it may be.

It is to be observed that no constitutional or statutory provision of the United States was, or ever has been, necessary to the right of any person to make an invention, discovery, or machine, or to use it when made, or to sell it to some one else. Such right has always existed, and would exist now if all patent laws were repealed. It is a right which may be called a natural right, and which, so far as it may be regulated by law, belongs to ordinary municipal legislation; and it is unaffected by anything in the constitution or patent laws of the United States.

The sole object and purpose of the laws which constitute the patent and copyright system is to give to the author and the inventor a monopoly of what he has written or discovered, that no one else shall make or use or sell his writings or his invention without his permission; and what is granted to him is the exclusive right; not the abstract right, but the right in him to the exclusion of everybody else.

For illustration, an author who had written or printed a book always had the right to do so, and to make and sell as many copies as he pleased; and he can do this though he takes out no copyright for his work. But if he wishes to have the benefit of the exclusive right to do this, he can get it by securing a copyright under the act of congress. All that he obtains, then, by this copyright, all that he asks for or needs, and all it was designed to confer on him, is to make the right which he had already in common with everybody else, an exclusive right in him—a monopoly in which no one can share without his permission.

But let us suppose that the book which he has thus copyrighted is an obscene and immoral book, which, by the law of the state in which it is published, may be seized and destroyed, and for that reason; does this statute, which forbids any one else but him to print or publish it, authorize him to do so? Can he violate the law because no one else can do it? Does the copyright confer on him a monopoly of vice, and an immunity from crime? Suppose a discovery of a cheap mode of producing intoxicating liquor, in regard to which the inventor obtains a patent for the product; does this authorize him to defy the entire system of state legislation for the suppression of the use of such drinks? The answer is that the purposes of the patent law and of the constitutional provision are answered when the patentee is protected against competition in the use of his invention by others; and when the law prevents others from infringing on his exclusive right to make, use, or sell, its object is accomplished. This proposition is fully supported by the supreme court in the case of *Patterson* v. *Kentucky,* 97 U. S. 501. That case also cites with approval the following language from the opinion of the supreme court of Ohio in the case of *Jordan* v. *Overseers of Dayton,* 4 Ohio, 295:

"The sole operation of the statute [the patent law] is to enable him [the inventor] to prevent others from using the product of his labors, except with his consent. But his own right of using is not enlarged or affected. There remains in him, as in every other citizen, the power to manage his property or give direction to his laborers at his pleasure, subject only to the paramount claims of society, which require that his enjoyment may be modified by the exigencies of the community to which he belongs, and regulated by laws which render it subservient to the general welfare, if held subject to state control."

The principle is reaffirmed in *Webber* v. *Virginia,* 103 U. S. 344.

2. Does the Missouri statute impair the obligation of any contract? The only one to which we are referred as affected by it is the contract found in the patent between the United States and the patentee. Some reference is made to a contract between the *public* and the patentee. We know of no such contract in a case like this, except such as may be found to exist between the parties to it, namely, the United States on one side and the patentee on the other. If we

v.18,no.2—5

concede such a contract to exist, it can extend no further than the right granted to the patentee under the patent laws. We have already shown that this is not the original or absolute right to make, to use, and to sell, which is a right not dependent on the patent, but the right to be protected against the manufacture, use, or sale of this product by others without his permission. When the state of Missouri shall pass a law that everybody may manufacture, use, and sell oleomargarine, it will probably impair the obligation of the Mege patent. If it does not, it will certainly authorize the infringement of his right under the patent, and will be void for that reason. It will be, then, immaterial whether it impairs the obligation of his contract or not.

3. We are unable to see that it is a regulation of commerce among the several states. If it can be called a regulation of commerce at all, it is limited to the internal commerce of the state of Missouri. Being a criminal statute, there is no pretense that it can have any operation outside the boundary of the state. The person who manufactures or sells the article outside of the state is not liable to the penalties of law. The statute does not forbid its importation or exportation, the bringing of it into the state, or carrying it out of the state; nor is its use in the state forbidden to those who choose to use it even for food. It is only forbidden to manufacture it or to sell it for food, to take the place of butter for that purpose. For all other purposes it may be made and sold in the state, and for that purpose, or any other, it may be imported or exported without violating the law. If it could be seen that the law was directed by way of discrimination against the product of a sister state, while no such prohibition existed against the same product in Missouri, or was intended to prevent buying and selling between the states, or importation and exportation, whereby the citizens or the productions of a neighboring state were placed in a worse position in regard to that article than the citizens or the productions of Missouri, the argument would not be without force. Such is the doctrine laid down by the supreme court of the United States in *Woodruff* v. *Parham*, 8 Wall. 123; and in *Hinson* v. *Lott*, Id. 148; and *The State Freight Tax Case*, 15 Wall. 232; *U. S.* v. *Dewitt*, 9 Wall. 41.

4. We are next to inquire whether the statute deprives the owner of this product of his property, within the meaning of the clause of the fourteenth amendment which says: "Nor shall any state deprive any person of life, liberty, or property without due process of law." The statute does not, in direct terms, authorize the seizure or taking of any property, not even that whose manufacture is forbidden. The party is. not, in fact, deprived of this property by the statute, or by any proceeding which it authorizes. The personal punishment, by fine and imprisonment, which the statute imposes, must be inflicted according to the law of Missouri, which allows a trial by jury, with all the other forms which from time immemorial

have been held to be due process of law. The moneyed fine, then, and the liberty of which the party may be deprived, are undoubtedly imposed by due process of law.

If it be urged, as it has in some cases, that the effect of the statute upon the right to sell the property is such as to destroy its value, and therefore to deprive the owner of it, there are several answers to the proposition: *First*, the value of the property can hardly be so affected that the party may be said to be deprived of it, while it can readily be transported into some other state, and sold without restriction; *secondly*, and conclusively, that as to the product made or imported into the state after the passage of the statute, the statute was and must be taken as part of the due process of law, and deprived the party of nothing which he owned when it was passed, or which he had a right to make or acquire for sale as food at the time he did so make or buy it. The law in such case did not deprive him of his property. If he is injured in relation to that property, it is by his own action in buying or making it, with the statute before his eyes. That statute was, as to him and to this property, due process of law, of which he had due notice. *Bartemeyer* v. *State*, 18 Wall. 132. His injury or loss, if any, arises out of his determination to defy the law, and it is by the law and its mode of enforcement, which, existing at the time, is due process of law, that he must be tried.

5. The evidence in favor of the petitioner is abundant, and of the highest character, to prove that the article which he sells, and which he is forbidden to sell by the statute of Missouri, is a wholesome article of food prepared from the same elements in the cow which enable her to yield the milk from which butter is made, and when made by Mege's process is the equal in quality for purposes of food of the best dairy butter. No evidence is offered by counsel for Rucker or for the state to contradict this, because they say it is wholly immaterial to the issue before the court. A very able argument is made by counsel, whose ability commands our respect, to show that, such being the character of the article whose manufacture and sale is forbidden by the statute, the legislature of Missouri exceeded its powers in passing it. It is not so much urged that anything in the constitution of Missouri forbids or limits its power in this respect by express language, as that the exercise of such a power in regard to a property shown to be entirely innocent, incapable of any injurious results or damage to public health or safety, is an unwarranted invasion of public and private rights, an assumption of power without authority in the nature of our institutions, and an interference with the natural rights of the citizen and of the public, which does not come within the province of legislation. The proposition has great force, and, in the absence of any presentation of the matters and circumstances which governed the legislature in enacting the law, we should have difficulty in saying it is unsound. Fortunately, as the case before us stands, we feel very clear that, even if well founded,

this objection to the statute is one which we cannot consider in this case.

As already stated, when a writ of *habeas corpus* is issued by the circuit court in behalf of one in custody of a state officer, under judicial proceedings in state courts and under state laws, the only inquiry we can make is, whether he is held in "violation of the constitution, or of a law of congress, or a treaty of the United States." The act in question may be in conflict with the constitution of the state, without violating the constitution, or any law or treaty of the United States. It may be in excess of the powers which the people of Missouri have conferred on their legislative body, and therefore void, without infringing any principle found in the constitution, laws, or treaties of the United States.

We have, in the four objections to this statute first considered, examined all the points in which it is supposed to conflict with the constitution and laws of the United States, and we know of no others, and no others have been suggested. The proposition now under consideration, if well taken, is one for the consideration of the state court when this case comes to trial. It is, in a *habeas corpus* case in the federal courts, excluded by the express language of the statute conferring jurisdiction in such cases. This court does not sit here clothed with full and plenary powers either of common law or of criminal jurisdiction. Its criminal jurisdiction is still more limited than its jurisdiction at common law and in chancery. It has, in common with the district court, jurisdiction of all offenses against the statutes of the United States. Such is not the case before us.

Section 753 goes further, and authorizes the court to issue writs of *habeas corpus* in all cases where a person is in custody in violation of the laws of the United States, including its constitution and its treaties. The prisoner in this case is not prosecuted for a crime or offense against the United States. We have, therefore, no general jurisdiction of the case.

We have endeavored to show that while held under a law of Missouri by Missouri officials, it is not in violation of, it is not forbidden by, the constitution, or any law or treaty of the United States; and the act of congress, under which alone we can exercise the special power of issuing writs of *habeas corpus*, permits us to go no further.

The return of the constable, Rucker, to the writ is sufficient, and the prisoner must be remanded to his custody; and it is so ordered.

McCRARY, J., concurs.

———————

§ 1. PRELIMINARY. It is proposed in this note not to discuss what is laid down in the principle case, but to give an outline of the jurisdiction and practice of the federal courts in the use of the writ of *habeas corpus*, and to show the growth of that jurisdiction.

§ 2. JURISDICTION OF THE SUPREME COURT.[1] It is proper to state in the outset that the jurisdiction of the supreme court of the United States to issue this writ, and hear and determine causes of detention thereunder, is not derived from the acts of congress, but from the constitution itself, though by the terms of the constitution it is subject to regulation by congress. This grant of jurisdiction is found in section 2, article 3, of the constitution, which enumerates the cases to which the judicial power of the United States shall extend, provides for the exercise of an original jurisdiction by the supreme court in certain cases, and then recites that "in all the other cases before mentioned the supreme court shall have appellate jurisdiction, both as to law and fact, with such exceptions and under such regulations as the congress shall make." Now, the *original* jurisdiction with which the supreme court was clothed by this article did not embrace the use of the writ of *habeas corpus*. This court nevertheless issues this writ as an incident of, and means of, giving effect to *its other jurisdiction;* that is to say, in the limited classes of cases where it has original jurisdiction, as in cases affecting ambassadors, other public ministers, and consuls, or those in which a state is a party, it may undoubtedly, if the circumstances require it, exercise and effectuate its original jurisdiction by means of this writ. It is supposed that if a foreign ambassador were unlawfully restrained of his liberty within the limits of the United States, the supreme court of the United States could, in the exercise of its original jurisdiction "in all cases affecting ambassadors," enlarge him upon *habeas corpus.* But outside of this limited class of cases in which it has original jurisdiction, it cannot issue this writ when the issuing of it would involve an exercise of original jurisdiction. Thus, it cannot issue it at the suit of an alien to obtain the custody of an infant child,[2] nor can it, it is supposed, in cases of arbitrary arrests without legal process by military officers of the United States. From this it is seen that this writ is chiefly used by this court as an incident of its appellate jurisdiction. It is regarded as a writ in the nature of a writ of error, to be used subject to the regulations prescribed by congress, and to the general principles of law, in enlarging persons who are restrained of their liberty by the inferior federal judicatories, when acting in excess of their jurisdiction.[3] Accordingly, it has been held by this court that it has power to issue this writ in every case where a person is in jail under the warrant or order of another court of the United States.[4] This power was exercised as early as 1795 in a case where the district judge for the district of Pennsylvania had committed a person to jail on a charge of treason without any proper examination. The supreme court on *habeas corpus* admitted him to bail.[5] In a later case the same court, by its writ of *habeas corpus*, aided by its writ of *certiorari*, reviewed and reversed a judgment of the circuit court of the United States for the District of Columbia remanding a prisoner on *habeas corpus*.[6] In a more celebrated case a similar use was made of this writ. Two persons had been committed on a charge of complicity in the treason of Aaron Burr, by order of the circuit court of the United States for the District of Columbia.[7] Again, proceeding by *habeas corpus* and *certiorari*, the supreme court of the United States discharged the

---

[1] As to the appellate jurisdiction of the supreme court in *habeas corpus* cases commenced in the inferior federal courts, see *post*, § 18.

[2] Ex parte Barry, 2 How. (U. S.) 65.

[3] Consult upon this point Ex parte Siebold, 100 U. S. 371; Ex parte Bollman, 4 Cranch, 100; Ex parte Watkins, 3 Pet. 193, 202; S. C. 7 Pet. 568; Ex parte Wells, 18 How. (U. S.) 307, 328; Ableman v. Booth, 21 How. (U. S.) 506; Ex parte Yerger, 8 Wall. 85; Ex parte McCardle, 7 Wall. 506; Durousson v. U. S. 6 Cranch, 312; Wiscart

v. Dauchy, 3 Dall. 321; Ex parte Hamilton, Id. 17; Ex parte Burford, 3 Cranch, 448; Ex parte Milburn, 9 Pet. 704; Matter of Metzger, 5 How. (U. S.) 176; Matter of Kaine, 14 How. (U. S.) 103.

[4] Ex parte Bollman, 4 Cranch, 75; Ex parte Kearney, 7 Wheat. 38; Ex parte Yerger, 8 Wall. 85.

[5] U. S. v. Hamilton, 3 Dall. 17.

[6] Ex parte Burford, 3 Cranch, 448.

[7] U. S. v. Bollman, 1 Cranch, C. C. 373.

prisoner, on the ground that the commitment of the circuit court was not warranted in law.[1] It was held by the supreme court of the United States, in 1840, upon an equal division of the justices, which therefore prevented affirmative action, that under the twenty-fifth section of the judiciary act[2] that court had no jurisdiction of a writ of error to a state court to revise its decision upon a writ of *habeas corpus*, remanding a prisoner to the custody of the sheriff, to be delivered under a warrant from the governor of the state to the authorities of a foreign country, there to be tried for an alleged murder.[3] In subsequent cases this court has asserted and beneficially exercised a jurisdiction to review, by its writ of error, decisions rendered by the highest courts of the states in proceedings by *habeas corpus*, where federal questions are involved.[4]

§ 3. HISTORY OF THE FEDERAL STATUTES. There are four statutes regulating the use of the writ of *habeas corpus* by the federal courts and judges. The first is found in the fourteenth section of the judiciary act of 1789.[5] This provides that the writ shall in no case extend to prisoners in jail, unless where they are in custody under or by color of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify. This provision obliged the courts of the United States to stay their hands in the use of this writ in every case where it should appear that the prisoner was held under state process, although the proceedings under which he was held were absolutely void. It was intended that the judges of the federal courts should have no superintending control whatever over state judgments or state process in the use of this writ. The second statute was the act of 1833, which, at the time of its passage, was generally known as the "force bill."[6] It was adopted in consequence of the nullification ordinance of South Carolina. Its primary object was to protect the revenue officers of the government from state process while carrying out the acts of congress. It extended the use of the writ to persons in custody for acts done in pursuance of a law of the United States or of a judgment of any of its courts. Aimed, in the first instance, at those who sought to nullify the laws of the Union in South Carolina, it came, 20 years later, into use in cases where officers of the United States were arrested under state process for carrying out the provisions of the fugitive slave law of 1850. The third statute in this category is the act of 1842.[7] This grew out of the complications of the case of McLeod and the Canadian rebellion of 1837. This act extended the writ to foreigners acting under the sanction of their own government. It was called into existence by the necessity of preventing a single state from interfering with our foreign relations, by indicting and trying for murder a British subject for acts done as a belligerent, which indecent usurpation of jurisdiction a court of the state of New York had taken upon itself.[8] Then came our late civil strife, and out of this grew the necessity of protecting those who claimed the benefit of the national laws. Accordingly, congress passed in 1863 an act briefly alluded to hereafter; and later, by the act of February 5, 1867, extended the writ to "all cases where any person may be restrained of his or her liberty in violation of the constitution or of any treaty or law of the United States," and made the writ issuable by the "several courts of the United States and the several justices and judges of said courts within their respective jurisdictions."[9] All of these statutes are condensed in section 753 of the Revised Statutes of the United

1 Ex parte Bollman, (commonly cited as the case of Bollman & Swartwout,) 4 Cranch, 75.

2 1 St. at Large, 85.

3 Holmes v. Jennison, 14 Pet. 540.

4 Ableman v. Booth, 21 How. 506; Ex parte Tarble, 13 Wall. 3.7.

5 1 St. at Large, 82.

6 Act of March 2, 1833, c. 57; 4 St. at Large, 632.

7 5 St. at Large, 539.

8 People v. McLeod, 1 Hill, (N. Y.) 377.

9 14 St. at Large, 385.

States. It may be said of them generally, and especially of the last, that they have the effect greatly to enlarge the jurisdiction of the courts and judges of the United States in the use of the writ of *habeas corpus.* They have removed the impediment to its use which formerly existed and which was imposed by the act of 1789, where a prisoner was committed under state authority, provided his imprisonment is contrary to the constitution of the United States or treaties with foreign nations, or the laws of congress.[1]

§ 4. UNDER THE JUDICIARY ACT OF 1789. The judiciary act of 1789, after prescribing the jurisdiction of the district and circuit courts of the United States, and also that of the supreme court, contains the following section: " That all the before-mentioned courts of the United States shall have power to issue writs of *scire facias, habeas corpus,* and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions and agreeable to the principles and usages of law. And that either of the justices of the supreme court, as well as the judges of the district courts, shall have power to grant writs of *habeas corpus* for the purpose of an inquiry into the cause of commitment: provided, that writs of *habeas corpus* shall in no case extend to prisoners in jail, unless where they are in custody under or by color of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify." [2] For more than 40 years the jurisdiction of the federal courts in the use of the writ of *habeas corpus* was regulated solely by this statute. Under it, not only circuit courts of the United States, but also the judges thereof, were authorized to issue this writ for the purpose of inquiring into causes of commitment, and, except in cases where the privilege of the writ was suspended, to hear and determine the question whether the party was entitled to be discharged.[3] The use of the writ given by this statute extends to all cases of an illegal detention under color of the authority of the United States.[4] It enables a circuit court of the United States to inquire into the jurisdiction of a court martial convened under the authority of the United States, by which a person has been tried for an alleged military offense.[5] Where it appears on return to a *habeas corpus* thus issued by a judge of a federal court, that the prisoner is held under an execution of one of the national courts, under a valid judgment, the court nevertheless has power to discharge him, for any matter arising subsequently to the judgment, which may in law entitle him to his discharge. The court may, therefore, discharge him if it appear that he has been pardoned by the president.[6]

§ 5. REVIEW UNDER THIS ACT OF PROCEEDINGS BEFORE UNITED STATES COMMISSIONERS. The writ of *habeas corpus,* in connection with the writ of *certiorari,* is used by the circuit courts of the United States to review the proceedings of commissioners of those courts when acting as examining magistrates,[7] and also when acting by special appointment of a court of the United States, in a proceeding for the extradition of a fugitive from the justice of a foreign country, under the act of August 12, 1848, § 8.[8] This practice is an-

1 Ex parte Bridges, 2 Woods, 428.

2 Act of September 14, 1789. (1 St. at Large, 81.)

3 Ex parte Milligan, 4 Wall. 2, 110; Ex parte Bollman, 4 Cranch, 75.

4 Re Winder, 2 Cliff. 89; Ex parte Merryman, Taney, Dec. 246; Matter of McDonald, 9 Amer. Law Reg. (O. S.) 661.

5 Barrett v. Hopkins, 7 Fed. Rep. 312. Compare Wise v. Withers, 3 Cranch, 331; Dynes v. Hoover, 20 How. (U. S ) 82.

6 Greathouse's Case, 2 Abb. (U. S.) 382, before HOFFMAN, J.

7 Re Leszynsky, 25 Int. Rev. Rec. 71.

8 9 St. at Large, 302 et seq.; Rev. St. § 5270 et seq The following are some of the cases in which the writ has been thus used: Re Veremaitre, 9 N. Y. Leg. Obs. 129; Re Kaine, 10 N. Y. Leg. Obs. 257; Re Heilbronn, 12 N. Y. Leg. Obs. 65; Ex parte Kaine. 3 Blatchf. 1; Ex parte Van Aernam, 3 Blatchf. 160; Re Henrich, 5 Blatchf. 414; Re Farez, 7 Blatchf. 34; S. C. Id. 345; Re MacDonnell, 11 Blatchf. 79; S. C. Id. 170; Ex parte Van Hoven, 4 Dill. 414; Ex parte Lane, 6 Fed. Rep. 34; Re Fowler, 4 Fed. Rep. 303; S. C. 18 Blatchf. 430; Re Stupp, 12 Blatchf. 501.

alogous to the well-known use of the writ by state courts in re-examining the commitments of examining magistrates.

§ 6. · **Effect of the Proviso of this Statute.** The clause of this statute which has been most frequently drawn in question is the proviso which stays the hands of the federal judicatories in the use of the writ of *habeas corpus*, in all cases where prisoners are held in custody under authority of the states. Where a prisoner was confined by process emanating from a state court, no court of the United States could, in consequence of this proviso, bring him up on *habeas corpus* for any purpose save to examine him as a witness; and it was wholly immaterial· whether the law of the state under which he had been prosecuted was repugnant to the constitution of the United States or not.[1] An *attache* of a foreign embassy detained under the warrant of a state magistrate for a crime, in manifest violation of the privilege of his sovereign and in contravention of the law of nations, could not be discharged by the circuit court of the United States under this writ.[2] The circuit court of the United States could not issue this writ at the instance of bail in a civil case for the purpose of surrendering their principal and exonerating themselves, where the principal was confined in jail under process of a state court.[3] Although the late war between the states of the American Union was a civil war, and the opposing parties were belligerents,[4] and although an officer of the late confederate army was not rightfully amenable to prosecution for acts done under color and in virtue of his office, and could not, therefore, be rightfully held to answer, in the courts of one of the states, for murder in having been a member of a military court martial, under whose finding and sentence a citizen of such state had been executed for an offense which was a crime under the laws of war,—nevertheless, where such a person was held in the jail of one of the states to answer an indictment for murder, which indictment was based upon the facts stated, it was held that, under the operation of this proviso, a federal court had no power to release him on *habeas corpus*.[5] In order to present the case of an illegal restraint " under or by color of the authority of the United States," within this proviso, it is not necessary to the jurisdiction of the circuit or district courts or judges, that the prisoner should be held under any formal or technical commitment, though ordinarily this is necessary to the jurisdiction of the supreme court. Accordingly, jurisdiction at circuit has been asserted to issue this writ in cases where citizens are held in imprisonment by military officers of the United States.[6] These cases grew out of military arrests of civilians at the outbreak of the late civil war in 1861, and before the passage of the act of congress of 1863, and the proclamation of the president thereunder suspending the writ of *habeas corpus* in certain cases. The decision in the former case was by Chief Justice Taney at circuit in Maryland, and the latter by Mr. District Judge Treat in Missouri. In both of these cases, the use of the writ of *habeas corpus ad subjiciendum* as a means of relieving the citizen from arbitrary arrests without warrant, and in relation to the jurisdiction of the national courts, was considered with learning and ability.

§ 7. **Cases Arising within Places over Which the United States has Exclusive Jurisdiction.** The constitution of the United States provides that " the congress shall have power * * * to exercise exclusive legislation in all cases whatsoever over such district (not exceeding 10 miles square) as may, by session of particular states and acceptance of congress, become the seat of the government of the United States; and to exercise like authority over all places purchased by the consent of the legislature of the state in

---

[1] Ex parte Dorr, 3 How. (U. S.) 103.
[2] Ex parte Cabrera, 1 Wash. C. C. 232.
[3] U. S. v. French, 1 Gall. 2.
[4] The Prize Cases, 2 Black, 635.

[5] Ex parte McCann, 5 Amer. Law Reg. (N. S.) 158.
[6] Ex parte Merryman, Taney, Dec. 246; Matter of McDonald, 9 Amer. Law Reg. (O. S.) 661.

which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings."[1] The true meaning of this clause seems to be that whenever the United States is owner of the land which it uses as a fort, etc., the legislature of the state in which such land is included may *permit* congress to exercise exclusive jurisdiction over it. Where the United States, owning land for the purpose of a military fort within one of its terri-tories, by an act of congress, erects such territory into a state, without making any reservation of exclusive jurisdiction to the United States within the lim-its of the land which it thus holds for the purpose of a military fort, politi-cal jurisdiction over such land passes to the state thus created.[2] But if the legislature of such state subsequently, upon a suggestion of the federal secre-tary of war, passes an act ceding exclusive jurisdiction over such military res-ervation to the United States, the act will be effective to vest in the courts of the United States jurisdiction of crimes committed within such reservation, although such jurisdiction has never been formally and expressly assumed by an act of congress. Reasoning thus, it was held by Mr. Justice MILLER that a person committed by a commissioner of the circuit court of the United States to answer for a crime committed within the military reservation of Fort Leavenworth, was not entitled to be discharged by *habeas corpus*.[3] It has also been held that after a state has been admitted into the Union, the fact that within its boundaries there is land, the fee of which is in the United States, which is set apart as an Indian reservation, is not of itself sufficient to give to a court of the United States jurisdiction to try a person for a murder committed within the limits of such reservation. Accordingly, a prisoner held under an indictment in the United States circuit court for the district of Nevada, for a murder alleged to have been committed "at and within the boundaries of the Moapa Indian reservation of the United States of America, in the district aforesaid," was entitled to be discharged on *habeas corpus*.[4] On the other hand, by the very terms of the constitution, the jurisdiction which is acquired by the United States by the cession by a state of land for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings, and by the acceptance of such cession by congress, becomes, by strong infer-ence from the terms of the constitution, an "exclusive" jurisdiction. It be-comes subject to the "exclusive legislation" of congress; and, though the courts of the several states are bound by the laws of congress as part of the supreme law of the land, and though it is no doubt competent for congress to vest in the state judicatories the power to hear controversies arising under the laws of the United States, and competent for those judicatories, in the exer-cise of a comity, though not in pursuance of an obligation, to assume the ex-ercise of such power;[5] yet congress has committed the jurisdiction of crimes within these places exclusively to the federal tribunals, by enacting that "the jurisdiction vested in the courts of the United States, in the causes and pro-ceedings hereafter mentioned, shall be exclusive of the courts of the several states: 1. Of all crimes and offenses cognizable under the authority of the United States."[6] It is accordingly held that federal jurisdiction of crimes com-mitted within the limits of a navy-yard of the United States is exclusive of the state in which such navy-yard is situated, and that a person arrested by state process, on charge of a crime committed within such limits, is arrested in violation of the laws of the United States, within the meaning of section 753 of the Revised Statutes, and is entitled to be discharged upon *habeas cor-pus* by a court of the United States.[7]

1 Const. U. S. art. 1. § 9.
2 U. S. v. Stahl, Woolw. 192.
3 Ex parte Hebard, 4 Dill. 380.
4 Ex parte Sloan, 4 Sawy. 330.
5 The British Prisoners, 1 Woodb. & M. C. C. 70, Prigg v. Pennsylvania, 16 Pet. 539, 608.

6 Act Sept. 24, 1789, c. 20, §§ 9 and 11; 1 St. at Large, 76, 78. The language above given is as the law now stands in the Rev. St. U. S. at § 711.
7 Ex parte Tatem, 1 Hughes, 588.

§ 8. STATE PROSECUTIONS FOR ACTS WHICH ARE EXCLUSIVELY OF FEDERAL COGNIZANCE. The provision of the Revised Statues of the United States has been already pointed out, which vests in the courts of the United States a jurisdiction, exclusive of the courts of the several states, "of all crimes and offenses cognizable under the authority of the United States."[1] It seems to be established that congress may exclude the jurisdiction of the courts of the state from offenses which are within the power of congress to punish.[2] Many cases might, however, be cited where convictions by state tribunals of offenses within the power of. congress to punish have been upheld.[3] These decisions have proceeded generally upon the ground that congress had not exercised the power of providing for the punishment of the particular offense. When congress exercises this power the exercise of it is understood to exclude the power of the state to provide such punishment, unless such power is reserved to the state by the act of congress.[4] The provision of the Revised Statutes of the United States, above quoted, is not found in the same distinctive form in any previous federal statute, though the substance of it is drawn from sections 9 and 11 of the judiciary act of 1789.[5] It has been supposed by a learned federal judge in a recent case to have been framed *ex industria*, and to have been placed in the Revised Statutes, not merely for the purpose of excluding the jurisdiction of all other courts, federal as well as state, except as otherwise provided, which was the substance and effect of the provisions of the judiciary act, but for the express purpose of excluding the jurisdiction of the courts of the state.[6] It has been accordingly held by the federal courts at circuit that where a person is prosecuted in a state court for an offense which is an offense of federal cognizance, he may be discharged from imprisonment under such prosecution either before or after conviction; the federal courts proceeding upon the ground that the state courts have no jurisdiction. It was so held where the state prosecution was for passing counterfeit national bank bills.[7] It was likewise so held where the state prosecution was for perjury, which perjury was committed before a federal tribunal.[8]

§ 9. CONTESTS FOR THE CUSTODY OF CHILDREN. There is a difference of opinion as to whether the writ of *habeas corpus* may be used in the federal courts in cases of contest touching the custody of children, where the parties claiming such custody are residents of different states. It was held by Mr. District Judge LEAVITT in the southern district of Ohio, in 1858, that the federal courts have not jurisdiction to make such a use of this writ. The ordinary jurisdiction of the circuit courts of the United States, under section 11 of the judiciary act of 1789,[9] did not extend to such a controversy; for the matter in dispute had no value which could be estimated in money; and, as it was not a case within the ordinary jurisdiction of such courts, it was not a case where the writ of *habeas corpus* could be issued as ancillary to any other fed-

1 Rev. St. U. S. § 711, subs. 1.

2 1 Kent, Comm. 339; Houston v. Moore, 5 Wheat. 1; The Moses Taylor, 4 Wall. 411; Martin v. Hunter, 1 Wheat.304; Com. v. Fuller, 8 Metc. (Mass.) 313; Ex parte Houghton, 7 Fed. Rep. 657; Ex parte Bridges, 2 Woods, 429; S. C. *sub nom.* Brown v. U. S. 14 Amer. Law Reg. (N. S.) 576, affirming decision of Mr. District Judge ERSKINE, Id. 566; S. C. 4 Amer. Law Rec. 132, 178. See, also, Com. v. Tenney, 97 Mass. 50; State v. Adams, 4 Blackf. 146; State v. Pike, 15 N. H. 83; People v. Kelley, 38 Cal. 145; People v. Sweetman, 3 Parker, Crim. R. 358; Prigg v. Pennsylvania, 16 Pet. 539, 608.

3 Fox v. Ohio, 5 How. (U. S.) 410; State v. Randall, 2 Aik. 89; Com. v. Fuller, 8 Metc. (Mass ) 313; Moore v. Illinois, 14 How. (U. S.) 13; Com. v. Tenney, 97 Mass. 50; Jett v. Com. 18 Grat. 933; S. C. 7 Amer Law Reg. (N. S.) 260. See, also, U. S. v. Wells, 12 Amer. Law Reg. (N. S.) 424.

4 Sturgis v. Crowninshield, 4 Wheat. 122; Prigg v. Pennsylvania, 16 Pet. 589.

5 1 St. at Large, 76, 78.

6 Ex parte Houghton, 7 Fed. Rep. 657, 660, per WHEELER, J.

7 Ex parte Houghton, 7 Fed. Rep. 657, before Mr. District Judge WHEELER.

8 Ex parte Bridges, *sub nom.* Brown v. U. S. *ut supra.*

9 1 St. at Large, 78.

eral process or in aid of the exercise of any other jurisdiction.[1] The same view was taken of the question by Mr. District Judge BETTS, in the southern district of New York, where the writ was applied for in such a case by an alien.[2] On the contrary, as early as 1824, this writ was thus issued and used by Mr. Justice STORY at circuit, in the case of a contest for the custody of a child between a citizen of New York and a citizen of Rhode Island. The jurisdiction seems to have been conceded and to have been exercised without question.[3] In 1867, Mr. District Judge DEADY, of the district of Oregon, considered this question in an elaborate opinion, in a case where the mother of a child, being a citizen of California, had sued out a writ of *habeas corpus* before him to obtain its custody from its father, her divorced husband, who had removed with the child to Oregon. The learned judge decided in favor of the jurisdiction, and awarded the custody of the child to the mother.[4] In a case just alluded to, the circuit court of the United States for the southern district of New York, in 1844, Mr. District Judge BETTS presiding, refused to issue a writ of *habeas corpus* at the suit of an alien husband residing in Nova Scotia, to obtain the custody of his child from his wife residing in New York. From this decision a writ of error was prosecuted in the supreme court of the United States, but the writ was there dismissed for want of jurisdiction. The supreme court proceeded upon the ground that the judgments of the circuit courts of the United States can be reviewed by the supreme court on writ of error, only where the matter in dispute exceeds the sum or value of $2,000, which matter of dispute must have a known and certain value, such as can be proved and calculated in ordinary business transactions.[5] This principle is just as fatal to the jurisdiction of the circuit court of the United States in the issuing of the writ of *habeas corpus* as an original writ in such a case, as it is to the jurisdiction of the supreme court to review upon error such a decision of the circuit court. There is no matter in controversy possessing a pecuniary value to the amount of $500, such as is necessary to give jurisdiction of controversies between citizens of different states to a circuit court of the United States, under the eleventh section of the judiciary act. Notwithstanding the high authority to the contrary, it seems to the writer entirely beyond question that no such jurisdiction exists. If the question of jurisdiction had been argued and contested before a judge as eminent as Mr. Justice STORY, it scarcely admits of doubt that he would have decided against it. It would be just as easy to support a jurisdiction in the federal circuit court to issue a writ of replevin at the suit of a citizen of another state from that in which the defendant resided, for a chattel of the value of five dollars, as to issue a *habeas corpus* to obtain the custody of an infant child, whose custody possesses no pecuniary value in law.[6]

§ 10. UNDER THE ACT OF 1833. The second statute regulating the use of *habeas corpus* in the federal courts was the act of 1833,[7] commonly called the "force bill." It was entitled "An act further to provide for the collection of duties on imports." As already stated, it was adopted in consequence of the nullification ordinance of South Carolina. Its object was to enable the president and the national courts to enforce the laws of the Union in that state against the efforts of the state authorities to prevent the collection of the federal revenue. It contained two provisions relating to the writ of *habeas cor-*

---

1 Ex parte Everts, 1 Bond, 197.

2 Barry v. Mercein, MS. See the case on error, 5 How. 103.

3 U. S. v. Green, 3 Mason, 482.

4 Bennett v. Bennett, Deady, 299.

5 Barry v. Mercein, 5 How. 103.

6 In Ex parte Barry, 2 How. 65, the supreme

court of the United States refused to issue the writ of *habeas corpus* in such a case, on the ground that it would be the exercise of an original jurisdiction, which the court did not possess.

7 Act of March 2, 1833, c. 57, § 3; 4 St. at Large, 632.

*pus.* The first is found in section 3. This section provided for the removal of causes from the state courts to the United States circuit courts, where such causes consisted of prosecutions "against any officer of the United States, or other person, for or on account of any acts done under the revenue laws of the United States, or under color thereof, or for or on account of any right, authority, or title set up or claimed by such officer or other person under such laws of the United States." Among other things, this section provided that "it shall be the duty of the clerk of said United States circuit court, if the suit were commenced in the court below by summons, to issue a writ of *certiorari* to the state court, requiring said court to send to the said circuit court the record and proceedings in said cause; or, if it were commenced by *capias* he shall issue a writ of *habeas corpus cum causa,* a duplicate of which said writ shall be delivered to the clerk of the state court, or left at his office by the marshal of the district, or his deputy, or some person duly authorized thereto; and thereupon it shall be the duty of the said state court to stay all further proceedings in such cause, and the said suit or prosecution, upon delivery of such process, or leaving the same as aforesaid, shall be deemed and taken to be moved to the said circuit court, and any further proceedings, trial, or judgment therein in the state court shall be wholly null and void; and if the defendant in any such suit be in actual custody on mesne process therein, it shall be the duty of the marshal, by virtue of the writ of *habeas corpus cum causa,* to take the body of the defendant into his custody, to be dealt with in the said cause according to the rules of law and the order of the circuit court, or of any judge thereof in vacation."[1]

But the provision of this statute with which we are principally concerned enlarges the jurisdiction of the federal courts in the use of the writ of *habeas corpus ad subjiciendum* in the following language: "That either of the justices of the supreme court, or a judge of any district court of the United States, in addition to the authority already conferred by law, shall have power to grant writs of *habeas corpus* in all cases of a prisoner or prisoners, in jail or confinement, where he or they shall be committed or confined, on or by any authority or law, for any act done, or omitted to be done, in pursuance of a law of the United States, or any order, process, or decree by any judge or court thereof, anything in any act of congress to the contrary notwithstanding. And if any person or persons to whom such writ of *habeas corpus* may be directed, shall refuse to obey the same, or shall neglect or refuse to make return, or shall make a false return thereto, in addition to the remedies already given by law, he or they shall be deemed and taken to be guilty of a misdemeanor, and shall, on conviction before any court of competent jurisdiction, be punished by fine not exceeding $1,000, and by imprisonment not exceeding six months, or by either, according to the nature and aggravation of the case."[2] As already intimated, the primary object of this statute was to protect the revenue officers in carrying out the acts of congress in South Carolina.[3] At the time when it was enacted, it was not supposed that it would come into general use in the other states. But it became necessary, 20 years later, to resort to it for the purpose of discharging from state custody officers of the

---

[1] 4 St. at Large, 633. The provisions of this section are embodied in the Rev. St. § 643. It has been construed and applied in the following cases: Dennistoun v. Draper, 5 Blatchf. 336, NELSON, J.; Abranches v. Schell, 4 Blatchf. 256; Wood v. Mathews, 2 Blatchf. 370; Vietor v. Cisco, 5 Blatchf. 128; Peyton v. Bliss, 1 Woolw. 170; Warner v. Fowler, 4 Blatchf. 311; Buttner v. Miller, 1 Woods, 620.

[2] Act of March 2, 1833, c. 57, § 7; 4 St. at Large, 634. The substantial feature of section 7 of this statute is embodied in that clause of section 753 of the Revised Statutes which prohibits the use of the writ of *habeas corpus* to the courts, justices, and judges of the United States, except in cases (among others) where the prisoner "is in custody for an act done or omitted in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof."

[3] Ex parte Bridges, 2 Woods, 428, 431; Ex parte Robinson, 6 McLean, 355.

United States and other persons imprisoned for executing the fugitive slave law of 1850. As the fugitive slave law itself has been repealed, slavery abolished, and as the state of things which led to those conflicts between federal and state jurisprudence have passed away, it will be sufficient merely to cite the cases in which the writ was thus used in the federal courts.[1] While the jurisdiction of the courts of the United States and the judges thereof, under this statute, to discharge on *habeas corpus* persons held in custody for acts done in pursuance of a law of the United States, is undoubted, yet it has been well said that the circumstances which warrant the exercise of this jurisdiction ought to be clear. In order to justify a federal court or judge in withdrawing, in this summary manner, a cause from the jurisdiction of a state court, it should appear with reasonable certainty that the person is indicted in the state court for an act done in pursuance of federal authority, and *warranted* by it. The reason is that if the federal court or judge makes a mistake in the exercise of this summary jurisdiction, resulting in the discharge of the prisoner, there is no process known to the law by which the mistake may be revised and corrected by the supreme court of the United States. But if the prisoner is left to take his trial in the state court, and if any of the rights secured to him by the constitution or laws or authority of the United States are violated in any judgment which may be there rendered against him, he may have the same corrected by a writ of error in the supreme court of the United States, under section 709 of the Revised Statutes.[2] The settled construction of this act appears to be that it gives relief to one in state custody, not only when he is held under a law of the state which seeks expressly to punish him for executing the laws or process of the United States, but also when he is in such custody under a general law of the state which applies to all persons equally, where it appears that he is *justified* for the act done because it was "done in pursuance of a law of the United States, or of a process of a court or judge of the same." [3]

§ 11. WHAT IS JUSTIFICATION UNDER FEDERAL AUTHORITY. (1) *Homicide by United States Marshal in Effecting an Arrest.* Whether the act for which the party has been arrested by state authority is justified under federal authority, within the meaning of the statute above cited, must, of course, remain in many cases a difficult question. Where a bailiff, appointed by a marshal of the United States, on process against a person for violating the internal revenue laws, attempted the arrest of the latter at his house in the night-time, and, after having made his authority known, was fired upon several times by such person, whereupon he fired upon and killed the latter, for which he was arrested by the state authorities and indicted for murder, he was discharged upon *habeas corpus* by BALLARD, J., of the district court of the United States for the district of Kentucky. The learned judge was very careful to disclaim any intention to interfere unduly with state authority, and he was careful to disclaim all right and power to discharge the relator on any such ground as that of self-defense. "A jury," said he, "would probably acquit him on such ground, independent of the process under which he acted; but I have nothing to do with any such inquiry. It belongs only to the state court. I have only to inquire whether what he did was done in pursuance of a law and process of the United States, and so justified—not excused—by that law and process.

[1] Ex parte Robinson, 6 McLean, 355; The Fugitive Slave Law, (charge of Mr. Justice NELSON to the grand jury.) 1 Blatchf. 635; Ex parte Robinson, 1 Bond, 39; S. C. 4 Amer. Law Reg. (O. S.) 617; Ex parte Jenkins, 2 Amer. Law Reg. (O. S.) 144; S. C. 2 Wall. Jr. 521; Ex parte Jenkins, Id. 539; U. S v. Morris, 2 Amer. Law Reg (O. S.) 348; Ex parte Sifford, 5 Amer. Law Reg. (O. S.)

659; Matter of Ralph, Morris, 1; Matter of Peter, 2 Paine, 348.

[2] Re Bull, 4 Dill. 3.3.

[3] U. S. v. Jailer, 2 Abb. (U S.) 265, 277, before BALLARD, J. See Ex parte Jenkins, 2 Wall. Jr. 521; Id. 539; U. S. v. Morris, 2 Amer. Law Reg. (O. S ) 348; Ex parte Robinson, 6 McLean, 355; Ex parte Trotter, cited in 2 Abb. (U. S.) 277; Thomas v. Crossin, 3 Amer. Law Reg. (O S ) 207.

If the relator is to be discharged by me, it is not because he is excusable, upon general principles of law, for taking the life of his assailant when it was necessary to save his own, but because he was *authorized* and is *justified* by the law and process under which he acted to do all that he did. If he was not *authorized* and is not *justified*, by that law and process, in all that he did, he is not imprisoned 'for an act done in pursuance of a law of the United States, or of a process of a court or judge of the same;' and I cannot discharge him, but must remand him. I can discharge only an officer who relies on the law and process of the United States as his sole authority and complete justification." The learned judge then proceeded to examine the authorities, and, upon a consideration of them, concluded that a homicide committed by an officer in a struggle which ensues upon his endeavoring to effect a lawful arrest, which is brought about and rendered necessary by the resistance of the person whom he attempts to arrest, is a *justifiable* homicide, in contradistinction from homicide *se defendendo*, which writers upon the common law of crimes denominate *excusable* homicide; and he therefore concluded that, in the particular case, the process justified and authorized the homicide; that the relator was hence imprisoned for an act " done in pursuance of a law of the United States, or of the process of a court or judge of the same," and was hence entitled to his discharge.[1]

(2) *Arrests by United States Deputy Marshals at Congressional Elections.* It has been held that section 2021 of the Revised Statutes of the United States, which provides for the appointment of special deputy marshals to attend at the election of representatives and delegates in congress, and section 2022, which defines the duties of such deputies, among other things, to keep the peace and preserve order at the polls, are authorized by section 4 of article 1 of the constitution of the United States, and are hence valid. And where such deputy marshals had arrested a person for creating a disturbance at a poll at such election, and another person for circulating fraudulent tickets, and such deputy marshals were subsequently indicted in a court of the state for an assault and battery and intimidation of voters, the indictment being predicated upon the acts stated, they were released by a court of the United States on *habeas corpus*.[2]

§ 12. WHETHER THE STATE'S ATTORNEY SHOULD HAVE NOTICE. Although, in cases where the writ of *habeas corpus* is issued under this statute, the state's attorney is not entitled as of right to notice, and the statute does not require it to be given, yet a proper respect for the state authorities, and for the rights of the state in the premises,—at least, a decent spirit of comity, —suggests that this be done,[3] especially in view of the general practice in the state courts of notifying the state's attorney in *habeas corpus* cases where the prisoner is held under the state's process.

§ 13. OFFENSES AGAINST STATE LAWS COMMITTED UNDER MERE COLOR OF FEDERAL PROCESS. A person who makes use of legal process for the purpose of committing a crime is none the less guilty of the crime committed. Thus, if a person makes use of legal process for the purpose of obtaining possession of personal property, *animo furandi*, he is guilty of larceny.[4] It is obvious that a person may make use of federal process for the mere purpose of doing an act which is a crime under the laws of the state, though not a crime under the laws of the United States. The circumstance that he would be amenable to punishment for contempt of the federal tribunal, whose process he has thus abused, would not, on principle, oust the jurisdiction of the

[1] U. S. v. Jailer, 2 Abb. (U. S.) 265.

[2] Matter of Engle, 1 Hughes, 592, before BOND, Circuit Judge.

[3] See the judicious observations of the late Judge BALLARD on this point in U. S. v. Jailer, 2 Abb. (U. S.) 265, 267.

[4] Com. v. Low, Thatch. Crim. Cas. 477.

state courts to punish him for the crime. Accordingly, where a private person makes use of the process of the federal courts for the purpose of committing a larceny, as where he enters into a conspiracy with others to sue out a fraudulent writ of replevin upon a worthless bond, for the purpose of getting possession of property which he is not entitled to have, and of spiriting it out of the state, and is arrested and prosecuted therefor by the state authorities for larceny, it has been held by a learned federal judge that he is not entitled to be discharged by a federal court on *habeas corpus.*[1] It was said that there is a clear distinction between such a case and the case of an officer justifying under process which, though erroneously sued out, is valid on its face. This rule does not extend to the protection of the *party* who sues out the process. As against him, it may be shown to be void by reason of extrinsic facts not disclosed on its face.[2] But where a person got possession of the body of another person in Nebraska, under a requisition from the governor of Illinois, for the ostensible purpose of taking him to Illinois, there to answer for a crime, but, instead of so taking him to Illinois, took him, without any other warrant or process, to England, and was thereafter, for the doing of this act, indicted in a court of Nebraska for kidnapping, he was discharged from imprisonment under such indictment by a federal judge, on grounds which are reasoned at length in an opinion, but which are not all clear. He was supposed to have been imprisoned "in violation of the constitution or of a law or treaty of the United States," within the meaning of the act of 1867 as embodied in section 753 of the Revised Statutes of the United States.[3] But this seems to be as clearly a *non sequitur* as though he had gotten possession of the body of the prisoner under process of state extradition, and had then taken him out and murdered him.

§ 14. UNDER THE ACT OF 1842. This statute was entitled "An act to provide further remedial justice in the courts of the United States." It enacts as follows: "That either of the justices of the supreme court of the United States, or judge of any district court of the United States, in which a prisoner is confined, in addition to the authority already conferred by law, shall have power to grant writs of *habeas corpus* in all cases of any prisoner or prisoners in jail or confinement, where he, she, or they, being subjects or citizens of any foreign state, and domiciled therein, shall be committed or confined or in custody under or by any authority or law, or process founded thereon, of the United States, or of any one of them, for or on account of any act done or omitted under any alleged right, title, authority, privilege, protection, or exemption set up or claimed under the commission, or order or sanction, of any foreign state or sovereignty, the validity and effect whereof depend upon the law of nations, or under color thereof. And upon the return of the said writ, and due proof of the service of notice of the said proceedings to the attorney general or other officer prosecuting the pleas of the state, under whose authority the petitioner has been arrested, committed, or is held in custody, to be prosecuted by the said justice or judge at the time of granting said writ, the said justice or judge shall proceed to hear the said cause; and if, upon hearing the same, it shall appear that the prisoner or prisoners is or are entitled to be discharged from such confinement, commitment, custody, or arrest, for or by reason of said alleged right, title, authority, privileges, protection, or exemption, so set up and claimed, and the laws of nations applicable thereto, and that the same exists in fact and has been duly proved to the said justice or judge, then it shall be the duty of the said justice or judge forthwith to discharge such prisoner or prisoners accordingly. And if

[1] Ex parte Thompson, 1 Flippin, 507.

[2] Savacool v. Boughton, 5 Wend. 173; Loder v. Phelps, 13 Wend. 48; Adkins v. Brewer, 3 Cow. 206; Whitney v. Schufelt, 1 Denio, 594; Rogers v. Mulliner, 6 Wend. 597; Taylor v. Trask, 7 Cow. 249; State v. Weed. 21 N. H. 262.

[3] U. S. v. McClay, 4 Cent. Law J. 255.

it shall appear to the said justice or judge that such judgment or discharge ought not to be rendered, then the said prisoner or prisoners shall be forthwith remanded: Provided, always, that from any decision of such justice or judge an appeal may be taken to the circuit court of the United States for the district in which the said cause is heard; and from the judgment of the said circuit court to the supreme court of the United States, on such terms and under such regulations and orders, as well for the custody and arrest of the prisoner or prisoners, as for sending up to the appellate tribunal a transcript of the petition, writ of *habeas corpus* returned thereto, and other proceedings, as the judge hearing the said cause may prescribe; and, pending such proceedings or appeal, and until final judgment be rendered therein, and after final judgment of discharge in the same, any proceeding against said prisoner or prisoners in any state court, or by or under the authority of any state, for any matter or thing so heard and determined, or in process of being heard and determined, under and by virtue of such writ of *habeas corpus*, shall be deemed null and void."[1]

It has been thought necessary to quote the statute as originally enacted, in order to give the reader a connected idea of its purposes. In the Revised Statutes of the United States, its various provisions are broken up and scattered through sections 753, 762, 763, 764, 765, and 766, and are so blended with other statutory provisions relating to this writ, that it would not be practicable so to separate them as to show the manner in which the provisions of this statute have been distinctively retained in the Revision. It is sufficient to say that, so far as the writer can see, all these provisions have been retained, including, perhaps, its most exceptional provision, which provides for an appeal to the supreme court of the United States. This provision is found in the Revision at section 763, clause 2, and section 764. So far as the writer knows, this is the only statutory provision now existing which provides for an appeal to the supreme court of the United States in *habeas corpus* cases. This statute did not reach the case of persons enrolled in the armies of the late confederate states. These persons did not, in contemplation of law, cease to be citizens of the United States, and did not become aliens within the meaning of this statute.[2]

§ 15. UNDER THE ACT OF 1863. The next act of congress regulating the use of this writ in the national courts was the act of March 3, 1863, entitled "An act relating to *habeas corpus*, and regulating judicial proceedings in certain cases." This act authorized the president to suspend the privilege of the writ of *habeas corpus* in certain cases; provided that lists of prisoners should be furnished by the secretary of state and the secretary of war to judges of the United States; provided the manner in which such prisoners might be discharged. These provisions, contained in the first three sections of the act, appear to have related to matters growing out of the exigencies of the then existing war, and are not necessary to be recited here. The four succeeding sections of which the act consisted related to the removal to the circuit court of the United States of prosecutions commenced against persons on account of acts done under the authority of the United States during the late rebellion, to procedure after such causes are so removed, and to the limitation of such actions.[3] A person arrested after the passage of this act, and under its authority, was entitled to be discharged on *habeas corpus*, if not indicted or presented by the grand jury convened at the first subsequent term of the circuit or district court of the United States for the district. The omission to furnish a list of the persons arrested, to the judges of the circuit court and

---

[1] Act of August 29, 1842, c. 77; 5 St. at Large, 539.

[2] Ex parte McCann, 5 Amer. Law Reg. (N. S.) 158.

[3] See Rev. St. § 643.

district court, as provided in the act, did not impair the right of the person so arrested, if not indicted or presented, to his discharge.[1]

§ 16. UNDER THE ACT OF 1867. The most important statute regulating the use of the writ of *habeas corpus* in the national courts is the act of February 5, 1867, c. 28.[2] In addition to the subjects to which the writ had been extended by previous statutes, it was by this statute further extended, in one sweeping clause, "to all cases where any person may be restrained of liberty in violation of the constitution, or of any treaty or law of the United States." It will be perceived that this language works a decisive innovation upon the act of 1789. We shall see that, as construed by the federal circuit and district judges, it entirely sweeps away the proviso of that act, which compelled the judges of the federal courts to stay their hands in the use of this writ whenever it should appear that the prisoner was held under state process. By the act of 1789 the state courts were left conclusive judges of the limits of their own jurisdiction, subject only to revision by the supreme court of the United States under the writ of error where federal questions might be involved. Their judgments, however erroneous, conclusively established the law of the particular case, until thus reversed in a direct proceeding.[3] The act of 1867, on the contrary, extended the writ to all cases where the prisoner, though held under state process, might, in the opinion of the federal court or judge issuing the writ, be held in violation of the constitution, or of any treaty or law of the United States. Thus, the federal circuit and district courts, and the judges of such courts, if the interpretation which has been put upon this statute is correct, have been clothed by it with a species of superintending jurisdiction over the state courts, without reference to their character or dignity. This will more clearly appear by the instances which I shall now give of questions which have been raised and decided by single judges, or by benches of two judges, in the federal courts of original jurisdiction, by this summary process.

§ 17 EXAMPLES OF QUESTIONS DECIDED ON HABEAS CORPUS UNDER THIS STATUTE. (1) *Effect of Ousting Clause in Fourteenth Amendment.* Under this statute the chief justice of the United States, in a summary proceeding by *habeas corpus*, assumed to pass upon the grave question of the validity of the acts of all state officials, who, having previously taken an official oath to support the constitution of the United States, had engaged in the late rebellion, or given aid and comfort to the same.[4] The circumstance that he decided that the provision of the fourteenth amendment, prohibiting such persons from holding office, was not self-enforcing, but needed the aid of an act of congress, and consequently that such persons were rightly in office, and the further fact that, previously to arriving at this conclusion, he had had the advantage of consulting with his associates of the supreme bench upon the question, does not detract from the gravity presented by the spectacle of a single judge deciding such a question in such a proceeding.

(2) *Validity of State Laws.* It has been held, in the circuit court of the United States for the district of California, that where an alien prisoner is held in custody under execution of a judgment rendered by a state court convicting him of an offense created by a state statute, and claims to be released on *habeas corpus*, on the ground that the statute under which he is convicted was passed in violation of the constitution of the United States, and of the provisions of a treaty between the United States and the nation of which he is a subject, the circuit court has jurisdiction, on a writ of *habeas*

[1] Ex parte Milligan. 4 Wall. 3, 117.
[2] 11 St. at Large, 387.
[3] Ante, § 6.

[4] Cæsar Griffin's Case, Chase, Dec. 367; S. C. *sub nom.* Re Griffin, 25 Tex. Supp. 624.

*corpus,* to inquire into the validity of the statute and judgment, and, if it finds it to be in violation of such constitution and treaty, to discharge the petitioner from custody. The court proceeds upon the ground that a statute of the state creating an offense, passed in violation of the constitution of the United States, or of a treaty with a foreign nation, is void, and that a judgment convicting a party of an offense created by such void statute is also void, and not merely erroneous and voidable. It is, therefore, not necessary that a prisoner so convicted should be remitted to a direct proceeding in the supreme court of the United States for the purpose of testing the validity of the state statute.[1]

(3) *Validity of State License Laws.* It is assumed, from what has preceded, that if a citizen of one state prosecuting business in another as a traveling merchant, agent, drummer, or commercial traveler, should be proceeded against in the latter state, for violating the license laws of such state, and imprisoned in such proceeding, a federal court or judge would, under the writ of *habeas corpus,* inquire whether such license laws of the state were in conflict with that provision of the constitution of the United States which confers upon congress the power to regulate commerce among the several states, and by implication denies the same power to the states;[2] and, if it should be of opinion that the state law was in conflict with such provision, would discharge the prisoner, thus exercising the grave power of passing upon the validity of the laws of the states. This was done in a recent case in the circuit court of the United States for California, though it was held that the law under which the prisoner was held in custody was not in conflict with the constitution of the United States, and he was accordingly remanded.[3]

(4) *Validity of State Fisheries Laws.* The fourth article of the constitution of the United States provides that the citizens of each state shall be entitled to all the privileges and immunities of the citizens in the several states. The legislature of Virginia, in 1874, passed an act prohibiting persons, other than citizens of Virginia, from taking or planting oysters in the waters of the commonwealth, under a penalty. It was held that a person indicted and imprisoned under this statute was deprived of his liberty in violation of the constitution of the United States, and might be released, on *habeas corpus,* by a judge of a court of the United States under the act of 1867.[4]

(5) *State Laws in Violation of Treaties—Anti-Chinese Legislation.* The present constitution of California contains the following provision: " No corporation now existing or hereafter formed under the laws of this state shall, after the adoption of this constitution, employ, directly or indirectly, in any capacity, any Chinese or Mongolians. The legislature shall pass such laws as shall be necessary to enforce this provision." [5] In pursuance of this constitutional ordinance, the legislature of California passed an act amending the Criminal Code so as to add a section providing that " any officer, director, manager, member, stockholder, clerk, agent, servant, attorney, employe, assignee, or contractor of any corporation now existing or hereafter formed under the laws of this state, who shall employ, in any manner or capacity, upon any work or business of such corporation, any Chinese or Mongolians, is guilty of a misdemeanor, and is punishable by a fine of not less than $100, nor more than $1,000, or by imprisonment in the county jail of not less than 50 nor

---

[1] Re Wang Yung Qui, 6 Sawy. 237.

[2] Upon the validity of such state laws, see Welton v. Missouri, 91 U. S. 282; Cook v. Pennsylvania, 97 U. S. 566; Hinson v. Lott, 8 Wall. 152; Woodruff v. Parkham, Id. 123; Brown v. Maryland, 12 Wheat. 419.

[3] Re Rudolph, 6 Sawy. 296. See, also, Ex parte

Touchman, 1 Hughes, 601, where a similar conclusion was reached. Compare Wood v. Maryland, 12 Wall. 418.

[4] Ex parte McCready, 1 Hughes, 598. This decision has been in part overruled by McCready v. Virgin a. 94 U. S. 391.

[5] Const. Cal. art. 19, § 2.

more than 500 days, or by both such fine and imprisonment." [1]  The second section of the fourteenth amendment to the constitution of the United States provides that "no state shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." The title of the Revised Statutes of the United States relating to "CIVIL RIGHTS" contains the provision that "all persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, and give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, as is enjoyed by white citizens, and shall be subject to like pains, penalties, taxes, licenses, and exactions of every kind and nature." [2]  The fifth article of the treaty between the United States and the Chinese Empire, known as the "Burlingame treaty," recognizes "the mutual advantage of the free immigration and emigration of the citizens and subjects" of both countries, "respectively, from one country to the other, for purposes of curiosity or trade, or as permanent residents." The sixth article provides that, "reciprocally, Chinese subjects visiting or residing in the United States shall enjoy the same privileges, immunities, and exemptions, in respect to travel or residence, as may there be enjoyed by the citizens or subjects of the most favored nation." It is thus apparent—and too apparent to be made clear by any argument, illustration, or suggestion—that the provision quoted from the constitution of California, and the act of the legislature of that state passed to enforce this provision, were in flagrant violation of the constitution of the United States, of the civil-rights law, and of the Burlingame treaty between the United States and the Empire of China. Nay, it is certain beyond all peradventure that the authors of this ordinance and this legislation knew them to be such, and passed them in the full face of such knowledge. A person who was prosecuted and imprisoned for the violation of this statute was beyond all doubt "in custody in violation of the constitution," and "of a law" and "treaty of the United States." The constitutional ordinance and the legislation filled out the whole limits of the clause quoted from section 753 of the Revised Statutes of the United States. Upon the statement of such a case to a federal court or judge, it would be his bounden duty to discharge a person so held in custody on *habeas corpus*. This was done by Mr. Circuit Judge SAWYER and Mr. District Judge HOFFMAN in 1880, sitting in the circuit court of the United States for the district of California. [3]  Each of these learned judges delivered a long and able opinion—a thing which may have been proper, considering the extraordinary nature of the case and the temper of the times, but which was wholly unnecessary to convince any lawyer of the entire propriety of their action. Indeed, the case before them is one so obvious as to decide itself upon a mere statement.

(6) *Arrest of Bankrupts under State Process.* Under a provision of the late bankrupt law, [4] where proceedings in bankruptcy were commenced against a person, he was thereafter not rightfully amenable to arrest under state process for debts which were dischargable in bankruptcy; and, if so arrested, he was entitled to be discharged on *habeas corpus* sued out before a federal circuit or district court or judge; [5] but where the debt for which the bankrupt was arrested was a debt such as was not dischargeable under the bankrupt act, he would not be so discharged. [6]  In exercising this power, it was held by one judge that it is the duty of the court issuing the *habeas corpus* to hear evidence, and determine upon its merits, the question whether the debt in respect of which the bankrupt had been arrested under the state process, was, in fact, a debt dischargeable in bankruptcy; that is, where the affidavit on which the

1 Cal. Act of February 13, 1880.
2 Rev. St. § 1977.
3 Parrott's Chinese Case, 6 Sawy. 349.

4 Rev. St. §§ 5107, 5117.
5 Re Williams, 11 N. B. R. 145
6 Re Alsberg, 16 N. B. R. 116.

order of arrest was procured in the state court charged ·that the debt was contracted through fraud, that the *habeas corpus* court should, upon independent evidence, try that issue.[1]  But abler and more experienced judges held, on grounds too clear for controversy, that such an issue cannot properly be tried before a single judge, on affidavits, in a summary proceeding by *habeas corpus*, but that it ought to be left to be contested before a jury in the state tribunal; and, accordingly, that the judge issuing the *habeas corpus* would not look further than to see that the affidavit, on which the order of arrest was procured in the state court, set forth facts showing that the debt was one which was not dischargeable in bankruptcy.[2]

(7) *Other Cases where the Prisoners have been Remanded.*  Several other cases have been found where the federal judges have been appealed to without success to enlarge prisoners under the provision of the Revised Statutes of the United States, which we are considering.  They have refused to do this where the prisoner had been committed by an examining magistrate of a state upon a charge of assault with intent to commit rape;[3] where a negro had been tried, convicted, and sentenced to a term of imprisonment for violating a law of the state which forbade the intermarriage of whites and negroes;[4] where the prisoner, an alien, had been indicted, tried, and convicted of a crime and imprisoned therefor under the sentence of a judge of a court of a state, who, though not possibly a judge *de jure*, was a judge *de facto*,—the circumstance intervening that the conviction had been affirmed by the supreme court of the state;[5] and where the prisoner was held in custody under process of contempt issued by a state court in the course of a suit pending therein, although the suit related to the property of Indians, over which, in consequence of special treaties and acts of congress, the state court had no jurisdiction.[6]

18. Provisions for Revising the Decisions of the Inferior Federal Courts or Judges on Habeas Corpus.  Such being the extensive powers exercised by the federal circuit and district courts and judges by means of the writ of *habeas corpus*, it becomes important to inquire what provision the law has afforded for revising their decisions, if erroneous.  And, first, it may be observed that the only appeal which is allowed in all cases, generally, is an appeal " from the final decision of any court, justice, or judge, inferior to the circuit court," in which case "an appeal may be taken to the circuit court for the district in which the cause is heard:  (1) In the case of any person alleged to be restrained of his liberty in violation of the constitution, or of any law or treaty of the United States; (2) in the case of any prisoner who, being a subject or citizen of a foreign state, and domiciled therein, is committed or confined or in custody by or under the authority or law of the United States, or of any state, or process founded thereon, or for or on account of any acts done or omitted under any alleged right, title, authority, privilege, protection, or exemption set up or claimed under the commission, order, or sanction of any foreign state or sovereignty, the validity and effect whereof depend upon the law of nations, or under color thereof."[7]  The only appeal which is allowed to the supreme court of the United States, so far as the writer can see, is an appeal "from the final decision of such circuit court

[1] Re Alsberg, supra, before Bradford, J.

[2] Re De Voe, 2 N. B. R. 27; S. C. 1 Lowell, 251; 7 Amer. Law Reg. (N. S.) 690; Re Volk, 3 N. B. R. 278; S. C. 3 Ben. 431.  See, also, Re Kimball, 2 N. B. R. 354; S. C. Id. 4to, 74; S. C. Id. 114.  Compare Re Glazier, 1 N. B. R. 336; S. C. Id. 4to, 73; Re Seymour, Id. 29; S. C. 1 Ben. 348.

[3] Re Taylor, 12 Chi. Leg. News, 17.

[4] Ex parte Kinney, 3 Hughes, 9.

[5] Re Ah Lee, 6 Sawy. 410; S. C. 2 Crim. Law Mag. 336.

[6] Ex parte Forbes, 1 Dill. 363, before Delahay, J.

[7] Rev. St. § 763.  Ex parte Bridges, 2 Woods, 428, is an example of an appeal from a district to a circuit court under the first clause of this statute.

* * * in the cases described in the last clause of the preceding section;"[1] that is, in the cases of prosecutions of aliens for acts done under the sanction of their own sovereign or the law of nations, or under color thereof. This last provision, as elsewhere stated, was intended to preserve the right of appeal in such cases as that of McLeod, which grew out of an act done as a belligerent pending the Canadian rebellion.[2] The act of 1867, c. 28,[3] which extended the writ of *habeas corpus* to "all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States,"[4] provided for an appeal to the supreme court of the United States in the following language: "From the final decision of any judge, justice, or court inferior to the circuit court, an appeal may be taken to the circuit court of the United States for the district in which said cause is heard, and from the judgment of said circuit court to the supreme court of the United States, on such terms, and under such regulations and orders, as well for the custody and appearance of the person alleged to be restrained of his or her liberty, as for sending up to the appellate tribunal a transcript of the petition, writ of *habeas corpus*, return thereto, and other proceedings, as may be prescribed by the supreme court, or, in default of such, as the judge hearing the said cause may prescribe; and, pending such proceedings or appeal, and until final judgment be rendered therein, and after final discharge in the same, any proceeding against such person so alleged to be restrained of his or her liberty, in any state court, or by or under the authority of any state, for any matter or thing so heard and determined, or in process of being heard and determined, under and by virtue of such writ of *habeas corpus*, shall be null and void."[5] Under this provision an appeal was taken from a judgment of the circuit court of the United States to the supreme court in the celebrated case of McCardle,[6] the circuit court having refused to discharge him from military custody, under the writ of *habeas corpus*. A motion to dismiss the appeal was made in the supreme court and denied.[7] The case was then argued at the bar upon its merits; the argument was concluded on the ninth of March, 1868, and the cause was taken under advisement by the court. While the cause was thus under advisement, and before the court had time to consider the decision proper to be made, congress repealed that part of the statute above quoted which gave an appeal to the supreme court, by a repealing act in the following words: "That so much of the act approved February 5, 1867, entitled, etc., as authorizes an appeal from the judgment of the circuit court to the supreme court of the United States, or the exercise of any such jurisdiction by said supreme court on appeals which may have been, or may be hereafter, taken, be and the same is hereby repealed."[8] This act had the effect of ousting the jurisdiction of the supreme court of the United States in the case of McCardle,[9] and it left no direct appeal to that court in *habeas corpus* cases, except in the single case provided for by section 764 of the Revised Statutes—the case of prosecutions of aliens, as above stated. But it did not have the effect of determining or impairing the general appellate jurisdiction which the supreme court of the United States had previously exercised over inferior tribunals of the United States, by means of the writ of *habeas corpus* aided by the writ of *certiorari;* and this jurisdiction extends as well to *habeas corpus* proceedings in the inferior courts of the United States, or before the judges of such courts, as to other proceedings which may be appropriate for its exercise, *in case such habeas corpus proceedings result in the remanding of the prisoner.* Accordingly, in the subsequent case of Yerger, where the questions involved

1 Rev. St. § 764.
2 Ante, § 11.
3 14 St. at Large, 385.
4 See Rev. St. § 753.
5 11 Rev. St at Large, 386.

6 6 Wall. 318; S. C. 7 Wall. 506.
7 Ex parte McCardle, 6 Wall. 318.
8 Act of March 27, 1868, (15 St. at Large, 44.)
9 Ex parte McCardle, 7 Wall. 506.

were in many respects similar to those which were involved in the case of McCardle, the circuit court of the United States having refused to discharge the prisoner on *habeas corpus* from the military custody in which he was held for trial before a military commission on a charge of murder, the cause was removed to the supreme court of the United States by its writ of *habeas corpus*, aided by its writ of *certiorari*. The supreme court, after argument, affirmed its jurisdiction thus to re-examine the decision of the circuit court.[1] A proceeding by *habeas corpus* is deemed a civil proceeding; and hence it cannot be re-examined in the supreme court upon a certificate of division of opinion in the circuit court, as criminal cases can; but, in such a case, judgment is entered in accordance with the opinion of the presiding judge, and thereafter it may be re-examined upon such certificate by the supreme court;[2] but whether it may be so examined where the decision of the presiding judge is in favor of *discharging* the prisoner is not clear. It remains, however, that no provision exists in the federal law for re-examining in the supreme court the decisions of the inferior federal courts or judges on *habeas corpus, in cases where the prisoner is discharged.* These decisions may result in declaring invalid the police regulations of a state, or even provisions of the state constitution, as will appear from cases already cited; and yet the state has no appeal, writ of error, or other means of bringing the question of the validity of its own constitution and laws to the final determination of the supreme court of the United States,—the tribunal which was established by the constitution for the determination of such questions. A statute which grew out of a temporary emergency, perhaps out of a party exigency, has deprived the federal jurisprudence of this necessary measure; and the most weighty considerations suggest the re-enactment, and perhaps the extension, of that clause of the act of 1867 which gave appeals to the supreme court of the United States in *habeas corpus* cases.                                          SEYMOUR D. THOMPSON. .

*St. Louis, Mo.*

[1] Ex parte Yerger, 8 Wall. 85.                [2] Ex parte Mulligan, 4 Wall. 110, 114; Ex parte Tom Tong, 17 Cent. Law J. 89.